## SALLIE E. WHEELER *vs.* JOHN M. WHEELER.

*Divorce—Abandonment—Evidence.*

When a wife compels her husband to leave her house, against his will, on account of his habitual drunkenness and failure to support his family, and the husband remains away but has an occasional interview with his wife elsewhere, the wife is not entitled to a divorce on the ground of abandonment, when there is no proof of the existence for three years of a deliberate purpose on the part of the husband to put an end to the marriage relation.

Under a bill for a divorce on the ground of abandonment, evidence as to the commission of a criminal act by the defendant, unconnected with the abandonment, is not admissible.

Appeal from the Circuit Court of Baltimore City (HARLAN, C. J,)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Thomas Ireland Elliott* (with whom was *Fred. T. Dorton* on the brief), for the appellant.

*John L. Sanford* (with whom was *Vincent J. Demarco* on the brief), for the appellee.

BOYD, J., delivered the opinion of the Court.

The appellant filed a bill in equity against the appellee, her husband, to obtain a divorce *a vinculo matrimonii.* After taking testimony orally, the Court below passed a decree dismissing the bill and awarding the custody of their two infant children to the mother. From that decree this appeal was taken.

The evidence shows that the appellant and appellee were married in March, 1887, and they lived with the parents of the former for ten years after that time in the city of Baltimore. In 1897 they moved to 2109 N. Charles street, in said city, where the appellant opened a boarding house. Her parents and her brother and sister went with them—her father paying board for himself and family. They remained at that house three years, when they moved to 2223 N. Charles street, and the appellee left there shortly afterwards, going to his parents' home. No testimony was taken on the part of the appellee, but that of the appellant shows that he was a dissipated man and did nothing to support his wife and children after May, 1899. For over a year previous to that time he had been giving his wife $12 a week, and before that $15 a week. She was asked on cross-examination to state the cause of his leaving the house and replied: "Mr. Wheeler had been himself

intoxicated for days and nights.    He was not supporting us. He was not doing anything for us, not even paying his board. He refused to pay his board to me and I told him one morning, if you come home again to-night after the third night, he was very much intoxicated, under the circumstances you will have to change your residence and I cannot support you and your children and permit you to come home intoxicated. You have ruined my boarding house, you have deprived me of supporting myself. He paid very little attention to it, and came home that night again at nine o'clock very much under the influence of liquor, and that was the cause." Again she was asked: "Q. Then Mr. Wheeler did not leave the house of his own accord, did he?    A. He left it just as I told you. He could have prevented leaving it if he wanted to, but he did not want to.    It would happen if he came home intoxicated again.    Q. Now, as a matter of fact, did your father, Captain Griggs, practically eject him from the house?    A. Yes sir." She said he had not contributed one cent to the support of his family for fourteen or fifteen months prior to that time. Her father corroborated her as to his habits and not supporting his family.    He said that from three months after their marriage "he was either intoxicated or under the influence of liquor for twelve years," and, in explanation of what he meant by the last expression, said, "Well, sometimes he would come home drunk and staggering, and other times he would come home a little more straight, but you could see he was inflated with liquor."    He was asked whether he made any effort "to wean him from that course of conduct" and replied, "I went to Mr. Wheeler time and time again and told him, I said, John, you better reform yourself and do better; if you do not you cannot live on your wife's earnings and what support I am giving her, and he said Captain give me a little more time, and I gave him more time."    In answer to what he meant by more time he said "I do not know what he meant by his time, whether he wanted to try to get something to do; I do not think he ever did, but this thing went on about fifteen months and finally I told him, I said, John you have either to

do one thing or the other, you cannot live on the earnings of my daughter, you have to support yourself or go somewhere else and support yourself." He was asked "After he left then, will you tell His Honor (whether) he has ever been back to your knowledge," and replied, "The evening he left the house he asked me how long this thing was going to last. I told him—I said John—I called him John—when you reform and can support your wife and children you can come back, and I haven't seen much of him or noticed much of him since that time." In the cross-examination of this witness the following appears: "Q. Now on the evening when he was compelled to leave the house, you testify that John asked you how long this thing was going to last? A. I did. Q. What did he mean by how long was this thing going to last? A. I took his meaning, I did not ask him, I took his meaning if he would ever be able to come back again, and I thought, by way of encouragment, if he would be a man and did right, reform, and get in a position to support his wife and children, he could come back to them. Q. Then you, yourself, were the cause of his being put out of that house, were you? A. I told him simply if he could not pay for what he ate and drank in that house, and slept there he better vacate the house. His wife was not able, and I did not propose to feed him." The appellant denied that the separation was forced upon her by her father, but added "Mr. Wheeler was ejected with my full consent and I told my father to do it."

It is not claimed that he ever used any violence toward his wife, or that he treated her cruelly or badly, excepting in so far as he failed to support her and his children, and was constantly intoxicated. We have stated at some length the evidence offered on the part of the appellant, as we think it clearly shows that she is not entitled under the law, as announced in this State, to a final divorce. Every right-minded person must condemn the conduct of a husband shown by this record, as no man has a right to subject his wife to the mortification and annoyance caused by his habitual intoxication, and no man, who has a proper conception of his duty to

his wife and children, would thus voluntarily fail to give them that support which they are entitled to have from him. We say "voluntarily" fail to support them because that is the way the law regards it, when his failure to do so is the result of drunkenness and not owing to some physical or mental disability, or other cause over which he has no control. Many women, be it said to their credit, rejoice in the fact that they are able to work for the support and comfort of their husbands and children, when their husbands by reason of sickness, misfortune, or similar cause, are unable to do so, but a woman ought not to be expected, and is not required, to toil for a drunken, worthless husband, who does nothing for his own support or that of his family. Our decisions therefore recognize the right in her to decline to do so, but they do not go so far as to authorize a dissolution of the bonds of matrimony for drunkenness, or a mere failure of support, or both, without other sufficient cause. Whether it would be wise to do so is not for us to determine, as we must administer the law as we find it established by statute, or decisions which are binding on us. The laws of the various States of this country are not uniform on the subject, and the question involves considerations which are not free from difficulty and are not altogether one sided. On the one hand it is said that separation of husband and wife without a divorce is liable to cause immoral conduct, while on the other it is contended that the danger of immorality is even greater when a divorce has given the man or woman the opportunity to mingle more freely with those of the opposite sex. However that may be, it cannot be denied by any one who has given the subject consideration that one of the great evils of the present day, and for some years past, is the facility by which the relation of husband and wife can be severed in many jurisdictions in this country. Many persons, even amongst those whose social position is such as will attract the attention of the public, seem to look upon a marriage contract as they do upon other contracts—that it can be rescinded at the will of the contracting parties. Such sentiments, if they prevail to any great extent,

must seriously affect the very foundation of society and weaken the bonds that should be deemed of the most important that can bind human beings together.    This Court has always refused to lend its aid to a too easy severance of those relations.

In *Shutt* v. *Shutt*, 71 Md. 193, a decree granting a divorce *a mensa et thoro* was reversed.   The wife was shown to have acquired the habit of drinking, which "finally ran into distressing excesses."    There was some evidence of violence offered to the husband on two or three occasions when the wife was under the influence of liquor and was beyond self control.    It was held that the evidence in that case did not establish such cruelty of treatment of the husband, according to the requirements of law, as would justify a decree of divorce on that ground, and that "drunkenness on the part of the wife, accompanied with gross and revolting language, and occasionally family broils does not *per se* constitute such 'excessively vicious conduct' as will justify a divorce *a mensa et thoro* under section 26 of Art. 16 of the Code"—that being section 37 of Codes of 1888 and 1904.   The Court through CHIEF JUDGE ALVEY said: "It may, no doubt, in connection with other grave offences against the marriage relation, be considered as an element in the habit and conduct of the party camplained of; but as an independent ground, drunkenness has never been considered, either in this State or in England, as furnishing cause to justify a divorce."   The Court referred to the fact that in some States there are statutes that make habitual or continual drunkenness a cause for divorce, and added: "We must suppose that if it had been the intention of the Legislature of this State to make drunkenness a cause of divorce, it would have been so expressly declared, and not left to doubtful construction or implication."" Again it was there said:   "Public policy and morality alike condemn these judicial separations of husband and wife, except when it cannot be avoided; for, as it has been justly said, such separations throw the parties back upon society in the dangerous character of a wife without a husband, and a husband without a wife."   Drunkenness not being a cause for

divorce under our laws, it cannot be successfully contended that a wife can require her husband to leave her house on account of his drunkenness, and then obtain a divorce upon the ground that he had thereby abandoned her.   Nor will his mere failure to support her and her children entitle the wife to a divorce *a vinculo matrimonii* under our laws.

The bill in this case is based on the sole charge that the appellee abandoned the appellant, in August, 1900, without cause or reason on the part of the appellant, and since said time and for a long time prior thereto, she had received nothing from him by way of support or maintenance for herself and two children.   It is alleged that the abandonment has continued uninterruptedly for at least three years, is deliberate and final and the separation is beyond any reasonable hope of reconciliation.   The evidence, as shown above, establishes the fact beyond all controversy that he did not leave his wife of his own accord but left because she required him to do so, and he certainly had no intention or expectation of remaining away permanently.   He asked her father when told to leave "how long this thing was going to last."   He wrote to his wife a number of times asking her to come to his mother's to see him.   She did go to see him at least three times, according to her own admission—spent a half hour with him the day after he left her house—and she wrote to him fixing times when she would meet him at his mother's and elsewhere.  She visited him as late as February, 1901.   The letters she wrote to him did not indicate bad feelings towards her husband but the contrary.   She said that up to the time of her last letter to him she would gladly have gone back to him if he had expressed a willingness to support her.   It is evident from her testimony that when she was trying to persuade him to agree to support her and the children he was not willing to return to the house, from which he had been ejected by her father, as the latter and his family were still there.   She was asked "You asked him to make an effort to do what?" and replied, "To support myself and two children.   He suggested I leave the house I am in, take another and take a few boarders, I to

rent it and furnish it, and he live with me and to take a few
boarders to support us, and I refused." He had given her
furniture that cost $400, just before they went to 2223 N.
Charles street. She may have thought that he would not aid
her in supporting the family and that she could not do so in a
house where she could not have a number of boarders, but
whatever would have been the result, it seems clear to us that
when this bill was filed there had not been such an abandon-
ment for three years as our statute requires to authorize a di-
vorce *a vinculo matrimonii.*

The case of *Gill* v. *Gill,* 93 Md. 652, is mainly relied on by
the appellant. In that case this Court, through JUDGE
PEARCE said that the rule announced in *Lynch* v. *Lynch,* 33
Md. 328, was "that abandonment, to constitute ground for a
final divorce, must be the deliberate act of the party com-
plained of, done with the intent that the marriage relation
should no longer exist, and this is in full accord with the best
considered cases elsewhere." We determined in the Gill case
that there had been an abandonment, but the defendant of his
own volition left the plaintiff in 1883 and never lived with her
afterwards. Her bill was not filed until December, 1892, and,
although the defendant was summoned she did not obtain a
decree *pro confesso* for some years afterwards, and then de-
layed the final hearing. There was no evidence that the plain-
tiff had done anything to justify the defendant in leaving her,
and when the case was heard there had been eighteen years of
uninterrupted separation and failure to provide a support for
his wife, "unexplained by the necessities of any business or
occupation, or by the inability due either to misfortune or nat-
ural incapacity, and such failure can only be regarded there-
fore as willful and deliberate." We quoted from *Gregory* v.
*Pierce,* 4 Metcalf, 479, where CHIEF JUSTICE SHAW said, "The
fact of desertion by a husband may be proved by a great va-
riety of circumstances, leading with more or less probabilily
to that conclusion. As, for instance, leaving his wife with a
declared intention never to return; marrying another woman
or living in adultery abroad; absence for a long time, not being

necessarily delayed by his occupation, or business, or otherwise; making no provision for his wife, or wife and family, being of ability to do so; providing no dwelling or home for her, or prohibiting her from following him; and many other circumstances tending to prove the absolute desertion before described." That was not a divorce case, but was a suit to recover of a married woman on a promissory note given by her for necessaries, for the support of herself and family. Although an agreed statement of facts showed that the husband left his wife in Massachusetts in 1816, did not return until 1818, when he remained with her for a week and again left her, and went to Ohio where he remained until his death in 1832, that he made no provision for the support of his wife and family after he left in 1816, and she supported them by her own labors, still the Supreme Court of Massachusetts declined to sustain the action of the lower Court in rendering judgment for the plaintiff, because it did not appear that the husband was able to provide for his wife, that he was not in correspondence with her, that he declared any intention to desert her when he left or manifested any such intention afterwards, or that he was not merely detained by sickness, imprisonment or poverty. It was held that the plaintiff had not sustained the burden of proof and the Court remanded the case for evidence to be taken. The conclusion reached in *Gill* v. *Gill*, was unquestionably correct, as the evidence showed an abandonment for many years of the wife by the husband, and his failure to provide for his wife taken in connection with other facts was evidence of his intention that the marriage relation should no longer exist, but what we have referred to in *Gregory* v. *Pierce*, shows how careful that Court was to require full proof of all the facts necessary to hold a married woman responsible, even for a debt incurred for necessaries. In the case now under consideration it is not only shown that when the husband left at his wife's instance, he had no intention that the marriage relation should no longer exist, but at least as late as the February following she had no such intention. As that was only about two years and

seven months before the bill was filed, there can be no doubt that there had not been such an abandonment for three years as our statute requires to be proven, in order to entitle the complainant to a final divorce.

Our statute authorizes the Court to "decree a divorce *a mensa et thoro* in cases where a divorce *a vinculo matrimonii* is prayed, if the cause proved be sufficient to entitle the party to the same." The appellant did not at the hearing, or in the brief, ask for that relief, and therefore we do not deem it necessary to determine whether the evidence in the record would have justified such a decree.

As the appellant cannot complain of it, and the appellee has not taken a cross-appeal, or even objected to it, we are not called upon to consider the effect or the propriety of the portion of the decree that awarded the custody of the children to the mother, notwithstanding the fact that the bill was dismissed.

There can be no doubt that the Court below was right in refusing to admit the testimony proffered by the appellant to show that the appellee had been guilty of embezzlement of funds of his employer. That could not reflect on the question involved, unless possibly it might have tended to show a reason for the appellee not being employed, but of course the appellant was not endeavoring to furnish an excuse for his failure to support her. For the reasons we have given, the decree will be affirmed.

*Decree affirmed, the appellant to pay the costs.*

(Decided June 21st, 1905.)