## MARGARET A. SCHILLING *v.* JOHN SCHILLING
[No. 30, April Term, 1934.]

152

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Malcolm J. Coan,* with whom was *Adolph Gutberlet* on the brief, for the appellant.

*Arthur R. Padgett* and *Edwin J. Wolf,* for the appellee.

DIGGES, J., delivered the opinion of the Court.

The appeal in this case is from a decree of the Circuit Court of Baltimore City, upon the bill of the husband against the wife on the ground of abandonment, which decree divorced the husband *a vinculo matrimonii* from the wife.

Abandonment, as a marital offense, entitling either spouse to an absolute divorce from the other, consists of the deliberate act of the defendant, done with the intent to terminate the marriage relation, which desertion must continue uninterruptedly for at least three years, be deliberate and final, and the separation must be beyond any reasonable hope of reconciliation. Code, art. 16, sec. 38; *Twigg v. Twigg,* 107 Md. 676, 69 A. 517; *Wheeler v. Wheeler,* 101 Md. 427, 61 A. 216; *Levering v. Levering,* 16 Md. 218. Or, as heretofore stated by this court, abandonment or desertion, as a marital offense, consists in the voluntary separation of one of the married parties from

the other, or the refusal to renew suspended cohabitation, without justification either in the consent or the wrongful conduct of the other. *Bishop on Marriage, Divorce and Separation*, vol. 1, pp. 1662, 1667; *Gill v. Gill*, 93 Md. 652, 49 A. 557; *Taylor v. Taylor*, 112 Md. 666, 77 A. 133; *Buckner v. Buckner*, 118 Md. 101, 84 A. 156; *Klein v. Klein*, 146 Md. 27, 125 A. 728; *Simmont v. Simmont*, 160 Md. 422, 153 A. 665. The law on this question is thoroughly well established, and the only duty of the court is to apply the law to the facts as disclosed by the record.

It is undisputed that the husband (the appellee) actually left and deserted the common domicile; his contention being that he was forced to leave because of the conduct and acts of his wife, they being such as to constitute constructive abandonment of him by her. The chancellor found the husband's contention to be supported by the testimony, and while the finding of fact by the lower court in such cases should be given great weight, we are unable to hold that the facts, as disclosed by this record, when applied to the law, entitle the husband to a divorce as contained in the decree.

The parties were married in 1918, and have since lived in Baltimore City. There are two children born of the marriage, who were twelve and thirteen years of age at the time the testimony was taken (November, 1933), and gave evidence in the case. The evidence further shows without dispute that between the time of the marriage and the time of final separation, which occurred in April, 1933, the husband had left the home many times, according to him, five or six times, and, according to the wife, as much as sixteen times. The occupation of the husband was that of an employee of the Baltimore City Fire Department, receiving a wage or salary of $135 a month. It also appears that he received compensation from the Federal Government for disability resulting from military service, of $27.75 a month, making a total monthly income of $162.75.

The husband testified that the trouble culminating in his leaving the common domicile started in 1929, when he

heard rumors that the wife was meeting a policeman in the rear first floor of a neighborhood grocery store; that on one occasion, not finding his wife at home, he went to this store and listened at the side door, and was positive he heard his wife's voice and that of the policeman; he then went to the front door and went in; that the policeman met him at an interior door and prevented him from getting into the rear room; that at that time "I tried to pull him out of the way and ripped his coat, so we had a little tangle there which gave her ample time to get out of there had she been in there, which I am sure she was. "Q. You did not see her there at that time? A. No, I could not see through the door. Q. Officer Lijewski was there? A. Yes, when I rushed through the door— not in the front door but the rear door to where this room was—I got that far and that is as far as I could get, and he stood in the doorway. We got on the street arguing and walking down the street to Russell Street, and I know it did not take more than a couple of minutes when my wife she came on the scene. I asked her about being in there, and she denied it. And she said I was foolish, it was my mind about her and Lijewski, there was nothing between them. I told Officer Lijewski at that time to stay away from her. I did not want those two to be caught together. He said he would stay away. I told her the same thing, and she said she would do what she pleased. * * * That was in 1929. Q. Go ahead and tell what happened in April 1930? A. Your Honor, I would come home from work from time to time and she would not have any meals on the table, and most of the time it would be cold meals and not cooked, and I got behind her for that, and it would be another argument; and then she refused to clean my clothes, and I had to take them to my mother's; and it led off and on like that until I could not stand it any longer. * * * I was going to work with dirty shirts, rumpled shirts, and they are very particular about being neat in the Fire Department, and I was almost ashamed of myself, the way I had to go in there. I could not stand it any longer. In the latter part

of April we had another quarrel and I told her I was going to go, and she first had told me to get the hell out, and she said when I paid her pay day I could get the rest of my clothes—she gave me just enough clothes to go to work with and a civilian suit, and told me when I came around and paid her for that pay, why I would get the rest of my clothes, which I did and she gave me the rest of my clothes, and I have been supporting her ever since and looking after the children."

On cross-examination he testified: "Q. How many times have you left your wife? A. I don't know. I have left her several times. Q. How many? A. I haven't any idea. I would say about five or six different times. Q. Let us get back to the day you left her. What was the real cause of your leaving? A. Her neglecting me, not cooking or washing my clothes—hounding me. Q. Did you stay at home on your days off, or would you always be out? A. Oh, yes, I stayed home sometimes, and sometimes I would be out."

He further testified that he had had no marital relations with his wife since the time of his leaving in April, 1930. There is also testimony by the husband or on his behalf to the effect that on one occasion his wife produced a pistol and required him to drive her to a point some distance from the home, the intimation being that she was threatening him and intended to do him bodily harm. The wife denies any such intention, and explains the occurrence in a manner which appeals to this court as being much more likely than the story told by the husband. But, without regard to the truth in that respect, it is undisputed that the occurrence referred to took place in 1933, while his leaving of the home occurred in 1930, at which time the husband claims he was forced to leave, due to the conduct of his wife. It is, of course, clear that any act of the wife nearly three years after the husband left the home could not have been the cause of his leaving, and cannot be relied upon as justifying his leaving three years before, even though we could accept his version of the pistol incident as being true.

Again, the husband says that he supported the wife and children while he was away, and admits returning to the wife's domicile many times after he left in April, 1930. The wife's testimony is to the same effect; and, further, that after he left they were on friendly terms, he paying her for the support of herself and children at least thirty dollars twice a month, and, in addition, buying clothing and other things for the children; that during his absence she and the children changed their place of abode two or three times, and at each place they lived the husband continued to visit, buying some furniture for the house and spending much time at the home during the day and night, at which time they lived together as husband and wife. This testimony was corroborated by both of the children, who from their testimony, it is apparent, were on friendly terms with their father, stating positively that he spent as many as three nights at the house, besides numerous visits during the day; that he helped them and their mother trim the Christmas tree and cook Thanksgiving dinner. The husband worked sometimes on a night shift, and at other times during the day; and the fact is established to our satisfaction that he treated his wife and children the same, and provided for them as amply, after he left in April, 1930, as before; the only apparent difference being that he spent most of his nights at his mother's or brother's, where he testified he lived after he left his wife. The testimony of the wife to the effect that "he treated me better when he was away from me than when he was with me" seems to be justified by the record.

There is no evidence justifying the husband's suspicions, if he had such, based on rumor, as to any improper relations between the wife and the police officer; as also there is no evidence of the police officer ever being in the home except on one occasion, when he was called by Frances Schilling, the daughter, to quiet a quarrel in progress between the husband and wife. The presence of the wife in the store, upon the occasion when the husband testified he recognized her voice and that of the police

officer, is emphatically denied. When the husband is asked, both on direct and cross examination, what was the cause of his leaving his wife, he makes no mention whatever of any improper relations between his wife and the officer, but says that he left because of her neglecting him, not cooking or washing his clothes, and hounding or nagging him. Neither is there any evidence of her refusal to permit his return to the home at any time he might desire; but, on the contrary, both the wife and children seemed to be much pleased whenever he saw fit to visit the home, and the wife says that upon those occasions they did have marital relations.

The law of this state does not permit the husband to physically leave the wife's domicile and justify his right to divorce upon the proof in this case; and while, under present conditions, husbands and wives desiring to be free from marital ties seem to be of the opinion that the slightest marital difficulty entitles them to a legal separation, it must be understood that the law of this state only permits divorce for grave and weighty causes, established by clear and convincing evidence. It may be true that the provisions of the chancellor's decree in this case would be as conducive to the future happiness of the parties, or even more so, than a refusal of the divorce; but the duty of the court under the law is clear, to deny a decree for divorce under conditions established by this entire record, and we must reverse the decree appealed from.

*Decree reversed, with costs to the appellant.*