CLARA D. HAGUE

*v.*

HENRY W. HAGUE.

[Decided July 23d, 1915.]

1. Evidence *Held* insufficient to show that defendant willfully deserted petitioner, and that the desertion was willful and obstinate and continued for two years.

2. Intemperance and drunkenness is no justification for a wife deserting her husband, and it does not amount to a constructive desertion on his part.

3. That a husband was inattentive to his wife, left her alone on holidays and during the evenings, is no ground for her deserting him, such conduct not constituting a constructive desertion.

4. That a husband failed to support his wife does not justify her in leaving him, for she has her remedy under the Divorce act. *2 Comp. Stat. 1910 p. 2038 § 26.*

5. In a suit for divorce, the husband is a competent witness on behalf of his wife.

6. Where petitioner's husband, who had been living apart from her, was called to testify in her suit for divorce, and he admitted he did not propose to again live with his wife, his testimony is to be jealously scrutinized.

7. Where petitioner wrongfully deserted her husband, the fact that, though he lived within a short distance of her, he made no effort to have her return does not show an intention on his part to desert her from the beginning.

8. To entitle petitioner to a divorce her testimony as to the desertion of her husband must be corroborated, and corroboration of the fact of separation and the husband's non-support is insufficient.

---

*Mr. J. Harry Hull,* for the petitioner.

BACKES, V. C.

This is an undefended action for divorce on the ground of desertion. The master, to whom it was referred, advised a decree, and his report came before me for approval during last summer's vacation of Advisory Master Biddle, who has charge of undefended divorce cases. The report was not approved because the petitioner's testimony failed to show willful, continued and obstinate desertion; her evidence was uncorroborated, and also if she intended to rely upon a constructive desertion, the justifying facts and circumstances of her leaving should have been pleaded. *Smithkin* v. *Smithkin, 62 N. J. Eq. 161.* At the request of counsel, the cause was re-referred to the master for further proof. The only witness called was the husband, whose testimony did not aid the petitioner's cause, and a divorce was denied and a decree of dismissal entered. From this decree an appeal has been taken, and I have been requested to give my reasons for denying the petitioner relief.

The petition alleges that the parties were married November 20th, 1909, and that in the month of December, 1911, the defendant deserted the petitioner, and that the desertion was willful, continued and obstinate for two years next before the commencement of the suit, February 27th, 1914. These facts may be gathered from the petitioner's testimony : After the marriage the couple lived with the petitioner's parents in Glen Ridge for three months. They then kept house on Washington street, in the same town ; from there they went to Caldwell Cedars; thence to "The Sign of the Hammer," a hotel on Bloomfield avenue, Montclair, where they lived in December, 1910, when the petitioner left the defendant and returned to her father's home, where she has ever since stayed. Her husband wrote her a letter asking her to return and make up with him, which she did not answer, and after a few days he left the apartment and went to his mother's home. The petitioner says she left him "simply because his conduct was unbearable." She gives these specifications of his conduct: He drank to excess; he was nagging and abusive (how or when she does not say) ; he was delinquent at meal times; he repeatedly pretended drunkenness on approaching home to make her unhappy; he locked himself in his room and told her he was going to take his life; they were frequently without means of support; they were behind in the payment of their bills; their desperate financial condition compelled them to move from one town to another; her husband's family insisted in a "brutal way" that she take employment at "The Sign of the Hammer;" her husband did not support her at all; she was obliged to earn her own living and contribute to his support; when they were first married, her husband came home early one afternoon and went skating and spent the evening, while she was at work; he repeated this upon two other occasions; he frequently went out in the evening and didn't return until two o'clock in the morning, when he told her his experiences and acted as if he were demented; he told her that he had lost his love for her; the bills were piling up and unpaid, and his conduct with regard to drinking was getting worse; she became fearful for herself and for him, and because of this she made up her mind that she had better leave him. On two holidays

he left her alone without explanation; he left her alone night after night, and she stood it as long as she could, and finally left, "because his drinking habits were getting worse, and he had told me he did not care about me, and I decided I had better leave him." They did not see each other again to speak to until October of the following year, when she called him on the phone, and made an appointment with him, which he kept. She asked him whether he was willing to let by-gones be by-gones, to which he replied that he did not know what he was going to do about it, and asked her to meet him in New York. Between that time and the following New Year's they met a number of times in New York; went to theatres and stayed over night at hotels. She suggested that they resume co-habitation in a furnished room in that city, to which he agreed, saying, it was the proper thing to do. But, she says, he wanted to do it but didn't want to do it as she did; he would not bind himself; he did not want to tell the family; he wanted to do it in an underhand way; he seemed anxious to start a home again and looked up furnished rooms. Their plans did not materialize and matters continued until, as the witness says, she made up her mind that it was not her husband's idea to make a home for her; that he just wanted her for one purpose, and that was all, and so she left him. She says it came over her by degrees that she should do this. Their last meeting was between December 25th and New Year's Day of 1911, when they went to dinner and theatre. She says she concluded not to continue things in that way and told her husband that she was not willing to go with him to a hotel in that manner, when he was unwilling to furnish a home. After trying to persuade her to change her mind, he escorted her to the "Settlement House," where they bade each other good-night in a friendly way, and separated. She has not seen him since, nor has he sought communication with her, although they have lived in the same town within a few blocks of each other. I have purposely excerpted her story from the depositions, because every expression is essential to her case.

Her brother-in-law, Brown, testified that since 1911 he has seen the defendant at his place of business in New York, and

on Decoration, 1914, playing a tennis tournament, and that he was without physical disability; that during the last two or three years he has seen him in the town and at the club, and that their only conversation was courtesies of the day; although the defendant had opportunities, he never talked with the witness about his wife or inquired for her, or spoke to him of their situation, and he never sought the witness to bring the two together. He says he knows that the petitioner has practically supported herself since the marriage, and only from what she told him does he know of their financial difficulty. Upon the re-reference the husband was called. He admitted that he had not lived with his wife since December of 1910; that during two years past he had not supported her, nor asked her to return to him, nor offered to provide her with a home; and, on cross-examination by the master, said: "I suppose it is true I have lost my love for my wife, naturally. I suppose the desertion is intentional in a certain way, for a great many reasons. I do not propose to live with her." He also admitted having taken her to theatres and hotels in New York, as the petitioner related, and that she had spoken to him about beginning a home again in a furnished room, and that he told her that he would not say anything to the family at that time, as to what they were going to do.

Now, the testimony of the petitioner far from shows a willful desertion of her by the defendant. She, in fact, deserted him. The grounds upon which she bases her reasons for leaving him —intemperance, inattentions and failure to support—are not such as to justify the separation on her part, amounting to a constructive desertion on the part of the husband. Intemperance is not. *Foote* v. *Foote, 61 Atl. Rep. 90; 14 Cyc. 611.* Failure to support is not. In *Palmer* v. *Palmer, 22 N. J. Eq. 88,* it was laid down by the chancellor that "there is no rule that makes want of sufficient support by a husband, or total want of support, a desertion of his wife. It is no cause for divorce, and this court cannot, by construction, convert it into a ground of divorce by calling it desertion." *Skean* v. *Skean, 33 N. J. Eq. 148; Rogers* v. *Rogers, 81 N. J. Eq. 479.* For such an affliction the wife has a remedy under section 26 of

the Divorce act (*Comp. Stat. p. 2038*) for maintenance and support. Her evidence does not show an intent upon the part of the husband to desert her; quite to the contrary. His letter to her, after she left him in December, 1910, shows clearly his dissatisfaction of her course and a desire for her return. When she again deserted him in December, 1911, what was his mental attitude towards her? He was anxious and willing that they should live together as husband and wife; but she was not, because he was tardy in his preparation and disinclined to make the reunion public at that time and also because she had lost faith in his honesty of intention to provide a home and support her. He expostulated when she threatened to leave. From this situation it is impossible to deduce an intention upon his part to then desert her. Her testimony shows that he was oppositely minded. And, is there anything in the case to show that within the next two months he changed his mind or that he did even after the commencement of this action? I fix two months, because the petition was filed in less than two years and two months from the alleged desertion. None, unless the testimony of the husband may be so interpreted. He was a competent witness in her behalf. *Schaab* v. *Schaab, 66 N. J. Eq. 334.* He is evidently indifferent as to the outcome of these proceedings, for he permitted the cause to go undefended—perhaps due to a willingness now that the marriage-tie be severed. He was drafted to help out a desperate situation, and, under the circumstances, his testimony is to be regarded with suspicion and carefully and jealously scrutinized before giving it credence. He says that he does not propose to live with his wife. In this he speaks of the then present and future. He was not asked when he had formed this intention, and it, of course, cannot be assumed to relate back to the date of the alleged desertion, for it clearly appears that he then wanted to live with her. What he meant in stating that he supposed "the desertion is intentional in a certain way, for a great many reasons," he was not called upon to explain, and if he had, I surmise he would have qualified by saying that but for his wife's desertion of him he would not be living in a state of separation. And, again, when was the intention to desert formed, if there was such an intention? If

within two years of the filing of the petition, then the cause had not ripened; if before the two years, the evidence does not establish it. The fact that the defendant, though living within a short distance of his wife, did not extend any effort to have her return to him, considering the manner in which she brought about the separation, cannot be regarded as indicating an intent on his part to desert her from the beginning. This fact does not bring the case within the doctrine of *Alward* v. *Alward*, *65 N. J. Eq. 28; Foote* v. *Foote*, *71 N. J. Eq. 273; Thomas* v. *Thomas*, *74 Atl. Rep. 125*, in which the facts justified the inference of an intention to abandon. The petitioner's evidence does not make out a case of desertion within the meaning of the statute.

Furthermore, it is not corroborated. It has been laid down repeatedly that a divorce will not be granted upon the unsupported testimony of the petitioner. *McShane* v. *McShane*, *45 N. J. Eq. 341*. Here, failure to support and the state of separation (and that is all the brother-in-law testified to) are not corroborating circumstances, as they were in the cases last cited, because they do not in themselves furnish an inference of intent to desert; and the depositions are barren of declarations or actions on the part of the defendant evincing an intention to do so. For aught that appears outside of the petitioner's testimony, she and her husband may be living apart by mutual acquiescence. I have searched the husband's testimony carefully, but can find nothing in it inconsistent with this hypothesis.

Besides this, the separation was not against the will of the wife. The husband's conduct may have inspired it, but it was the action of the petitioner that brought about the condition. She seems to have been content with the situation she created. *McGean* v. *McGean*, *63 N. J. Eq. 285*. It may be added that there is no corroborating proof of obstinacy.