CLARA D. HAGUE, petitioner and appellant,

*v.*

HENRY W. HAGUE, defendant and respondent.

[Submitted December 6th, 1915.  Decided January 28th, 1916.]

1. To turn separation by consent into a desertion, the complaining party, whether husband or wife, must put an end to the agreement by requesting a resumption of matrimonial cohabitation.

2. Where the separation is shown or may be inferred to have originated with the wife's consent, it will become desertion from the time the complaining party makes sincere overtures to terminate it.

3. It is an inflexible rule in this state that a divorce will not be granted upon the uncorroborated admissions or testimony of a party to the suit, and this applies to every element in the proofs necessary to sustain the decree.

4. In a suit for divorce the husband is a competent witness on behalf of his wife.

5. Where the testimony of the wife shows that, after living for a time separate from her husband, she made sincere overtures to terminate such separation and to resume matrimonial cohabitation, and that her husband refused and persisted continuously in such refusal for a period of two years, although he was free and able to resume matrimonial cohabitation if he had desired to do so, and the wife's testimony is corroborated by that of her husband and another witness, willful, continued and obstinate desertion justifying a decree of divorce is established.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, whose opinion is reported in *84 N. J. Eq. 674.*

*Mr. J. Harry Hull,* for the appellant.

The opinion of the court was delivered by

TRENCHARD, J.

This is an appeal from a decree dismissing the wife's petition for divorce in an undefended action.

The ground alleged was desertion in December, 1911. The petition was filed February 27th, 1914. The matter was referred to a special master to ascertain and report as to the truth of the allegations of the petition.

It appeared from the depositions taken that the parties were married in 1909, and that they lived together as husband and wife for a time with the wife's parents in Glen Ridge, in Essex county, and later at various places in the same county. No children were born of the marriage.

The testimony of the wife disclosed the following matters of fact: Her husband was employed in New York City. He drank to excess and neglected her and for long periods did not contribute anything to her support. They were frequently without means of support, except such as was earned by the wife, and their unpaid bills compelled them to move from one town to another. On the insistence of the husband's family they moved into a hotel and she took employment there, and in that way she earned her own living and contributed to his support. The husband's conduct grew worse, and upon his telling his wife that he "had lost all love for her," she left the apartment in the hotel and went to live at her father's house in Glen Ridge, still, however, retaining her employment at the hotel. After a few days the husband left the apartment and went to live at his parents' home in the same town. The petitioner and the defendant did not see each other again until October, 1911, when the petitioner concluded that she would "overlook everything." She sought out her husband, calling him on the 'phone, first at his house, and then at his club, and asked him if he would not meet her. He agreed and they met in Montclair. They "talked things over" and she asked him "if he was willing to let by-gones be by-gones," but he said he "did not know just what he was going to do about it." The defendant asked petitioner to meet him in New York City. At that time she was attending night school in New York and he was working there in the daytime. Accordingly they met in New York, went to a hotel, and for weeks thereafter, two of three times a week, she thus met him and stayed over night in various hotels. During this period she again asked him "if

he would let by-gones be by-gones," and make a home for them, and he again said he "did not know just what he would do." They talked about beginning a home in a furnished room somewhere and he said "we will not say anything to the family now as to what we are going to do." She had been spending the evenings with him in order, as she says, that they might "make up" and begin again in a new home. She suggested that they take a room. He agreed that it was the proper thing to do, but "he wanted to do it in an underhand way" and did not want to tell the family. This continued from October until one evening in the last week of December, 1911. They had been to the theatre together. The wife concluded that the defendant had no intention of making a home for her but rather wanted her for "one purpose and that was all," and that she "was not going to continue in that way." He wanted her to go to a hotel as usual. What followed may be best stated in her own words:

"I had told him that I was unwilling to go with him to a hotel in that manner when he was unwilling to furnish a home to live with me as man and wife should. When we separated that night at my cousin's home, after I had told my husband I was going back there to stay all night, we did not have any argument over that point. I had told him I was going back there and he escorted me to the house. We did not talk about the matter at the house. Prior to going to my cousin's house my husband had expostulated with me because I would not go to the hotel with him that night. In my opinion our more or less intimate relations from the early part of October, 1911, until the night between Christmas and New Year's, 1912, was on his part simply for that one reason. So I told my husband that night, the latter part of December, 1911, that I was going to my cousin's house to stay all night, and we did not discuss the matter. We just merely went up to the house and he said 'Good-bye.' He did not kiss me good-bye. He just left me and I have not seen him since. I have not made any attempt to see him. My husband has not made any attempt to see me either direct or through my family. No member of his family, so far as I know, have sought any communication with me or with any of my family. I live on Midland avenue, Glen Ridge, N. J., about four blocks south of Bloomfield avenue. My husband lives on High street, Glen Ridge, near Wildwood terrace, which is about three blocks north of Bloomfield avenue, and although I live as near as that to him I have not seen or heard from him from that day until this. My husband is a tennis player, and he goes around in society in Glen Ridge, N. J., very prominently. He belongs to the Glen Ridge Tennis Club and the Montclair Athletic Club. He is supposed to be very popular, and from what I hear he is out a great deal in Glen Ridge and Montclair society."

The special master, considering the testimony of the wife and that of the other witnesses to which we shall hereafter refer, concluded that a divorce should be granted for the cause of desertion and so reported. But such report was not approved by the vice-chancellor because he thought "the petitioner's testimony failed to show willful, continued and obstinate desertion; her evidence was uncorroborated, and also if she intended to rely upon a constructive desertion, the justifying facts and circumstances of her leaving should have been pleaded."

We are unable to concur in the conclusion of the learned vice-chancellor.

It is quite evident that the wife did not rely upon constructive desertion. She does not rely at all upon the separation of December, 1910. The narration of events leading up to and inclusive of that separation merely furnish the background of the petitioner's right of action.

She bases her right to a divorce upon the ground that she, in October, 1911, realizing that perhaps both had been at fault, sought out her husband and repeatedly, between that time and December 31st, 1911, asked him to live with her again, to begin a home again, even if it was only a furnished room, and that he refused and persisted in such refusal continuously for two years. She therefore relied upon actual desertion, and it was immaterial, except as it tended to explain what happened later, whether the separation in December, 1910, was with the consent of the parties, or whether it was justified by the conduct of the defendant.

The question for consideration is, Does the proof as a whole establish an intent upon the part of the husband to desert the wife in December, 1911, and if so, was such intent persisted in against the will of the wife continuously for two years?

We are constrained to think that these questions must be answered in the affirmative.

We have no doubt that the separation of 1910 was the result of the inconsiderate conduct and talk of the husband and his unjustifiable failure to furnish reasonable support for the wife. We may, however, assume that the separation in 1910 was by

consent. To turn such a separation into a desertion, the complaining party, whether husband or wife, must put an end to the agreement by requesting a resumption of matrimonial cohabitation. *Chipchase* v. *Chipchase, 48 N. J. Eq. 549; Reece* v. *Reece, 34 N. J. Eq. 32; McGean* v. *McGean, 63 N. J. Eq. 285; Currier* v. *Currier, 68 N. J. Eq. 7; McAllister* v. *McAllister, 71 N. J. Eq. 13.*

But even where the separation is shown or may be inferred to have originated with the wife's consent, it will become desertion from the time the complaining party makes sincere overtures to terminate it. *Hankinson* v. *Hankinson, 33 N. J. Eq. 66.*

In the court below it was thought that the petitioner's testimony as to the desertion was not corroborated.

It is, of course, an inflexible rule in this state that a divorce will not be granted upon the uncorroborated admissions or testimony of a party to the suit, and this applies to every element in the proofs necessary to sustain the decree. *Hires* v. *Hires, 61 N. J. Eq. 491; Sterling* v. *Sterling, 71 N. J. Eq. 59; Foote* v. *Foote, 71 N. J. Eq. 273; Howard* v. *Howard, 77 N. J. Eq. 186.*

But in the present case there was, under the rule stated, ample corroboration of the petitioner.

Mr. Brown, the brother-in-law of the petitioner, testified that he was present at the marriage of the petitioner and the defendant; that at the time of the marriage and continuously down to the commencement of this suit both parties resided in Glen Ridge or nearby in Essex county; that defendant did not support the petitioner and that she supported herself; that from October, 1911, to the present time both petitioner and defendant have resided in Glen Ridge within a few blocks of each other, but separate and apart, the wife living in the same household with Mr. Brown, and the husband elsewhere; that in October, 1911, the petitioner decided to make an attempt at a reconciliation with her husband; that nevertheless they continued to live apart; that he has seen them both quite frequently since October, 1911; that he has seen and talked

with the defendant ofttimes at his place of business in New York, and ofttimes at his club and at social functions in Glen Ridge, and that during all that time the defendant has never mentioned his wife, and has made no effort to effect a reconciliation and has contributed nothing to her support; that defendant was without any physical disability; that during her entire married life the petitioner has been compelled to support herself through her own exertions, notwithstanding the fact that her husband had ample earning power and was employed.

Nor is that all. The petitioner subpœnaed her husband before the master and his testimony was taken. He testified that since March, 1911, he has lived in Glen Ridge with his parents in the same town where his wife is living with her parents. He further says:

"I remember October, 1911, my wife telephoned to me. She telephoned to me at the Montclair Athletic Club. She asked me what I was going to do that afternoon and she spoke to me in a friendly way. I said I was not going to do anything, and she asked me if I did not want to take a walk. I told her I would, and we met each other and took a walk. I had not had any communication with my wife prior to that time except a short note. Prior to the time she telephoned to me I had seen her on the train two or three times. My wife and I lived together as man and wife just prior to December, 1910. In October, 1911, the telephone conversation took place, and then the walk we took together that afternoon was the first time I had any communication with my wife since December, 1910. At that time I do not remember whether my wife asked me if I was willing to let by-gones be by-gones. I can say that she did not make that statement. The afternoon we took a walk we were together about an hour and a half. I then saw my wife again about a week after we took that walk together. From that time until some time in December, 1911, I saw my wife about four or five times. On two occasions we were together in the city of New York at the Park Avenue Hotel. My wife spoke to me about beginning a home again in a furnished room. I told her we would not say anything just then as to what we were going to do. We never began a home again, as man and wife, in a furnished room. I never went to my wife and asked her to come back to me and make a home again. We saw each other a number of times between October, 1911, and the latter part of December, 1911. One evening during the week between Christmas, 1911, and New Year's, 1912, we went to the theatre together. After we separated that evening I did not see my wife again until about a week ago at a social function in the town of Glen Ridge. During all these two years I have never gone to my wife and asked her to come back to me. I have not contributed anything to her support for over two years, not since December, 1910. I have lived continuously in Glen

Ridge, N. J., since December, 1910, with the exception of those three months I remained in that apartment in Montclair, N. J. I went from the apartment in Montclair to 92 High street, Glen Ridge, N. J., to live with my mother and sister, and have lived there to this day. My wife has lived in another part of Glen Ridge, N. J., as far as I know. I have never made any offer to provide a home for her in all that time, nor have I contributed to her support all that time. I think it is true that I have lost my love for my wife. I do not propose to live with her, and I suppose the desertion is intentional on my part in a certain way for a great many reasons. There is no arrangement between my wife and me to get this divorce. She has done all this on her own responsibility and without any arrangement with me."

Of course the husband is a competent witness for the wife in a suit for divorce. *Schaab* v. *Schaab, 66 N. J. Eq. 334.* We are satisfied in this case that there is no collusion. We see no reason either to reject the husband's testimony or to regard it with suspicion. It is evident that he testified not from choice but by compulsion. No doubt he is indifferent to the result of this proceeding, as he has been to the comfort and welfare of his wife from the beginning.

Considering the proofs as a whole we are satisfied that in October, November and December, 1911, the wife sincerely endeavored by every means in her power to put an end to the then existing separation. She repeatedly requested the defendant to provide a home for her and resume matrimonial cohabitation, and he neglected and in effect refused so to do and persisted in such refusal continuously for the term of two years, although free and able to resume matrimonial cohabitation if he had desired to do so.

The court below seems to have found the husband "was anxious and willing that they should live together as man and wife, but she was not."

We are unable to reach such conclusion and find no testimony which will support it. It is true the wife said that "when I talked to my husband in October, 1911, and suggested that we live together again, he was anxious to start a home again." But this pretended "anxiety" of the husband is shown to have been a sham by his subsequent conduct in insisting upon clandestine meetings only in chance hotels, and his entire failure

to comply with his wife's most reasonable request to openly resume cohabitation if only in a furnished room. "Actions speak louder than words." The petitioner seems to have been a refined, intelligent, industrious and self-respecting woman. It was entirely unnecessary for the defendant to tell her in so many words that he had no intention of resuming cohabitation with her on a basis that would enable her to retain her self-respect. She correctly interpreted his conduct and discerned his purpose. With respect to the suggestion that the wife was not willing to live with her husband as his wife, we must say that in our opinion it finds no support in the evidence, and the contrary is clearly shown to be the fact.

These views lead to a reversal of the decree below and the granting of a final decree of divorce to the petitioner and appellant.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, KALISCH, BLACK, TERHUNE, HEPPENHEIMER—6.

*For reversal*—GARRISON, TRENCHARD, PARKER, BERGEN, MINTURN, VREDENBURGH, WHITE, WILLIAMS, TAYLOR—9.