## ETHEL G. RODGERS

### *vs.*

## JOHN RODGERS.

*Divorce—Abandonment.*

In a suit by a naval officer for divorce on the ground of abandonment, *held* that the bill should be dismissed, in view of plaintiff's confessed lack of affection for defendant, his unwillingness to have her join him at a place at which he was stationed, his failure to make any real effort towards a reconciliation, and the fact that his testimony as to her previously announced intention of securing a divorce was uncorroborated.

*Decided January 18th, 1923.*

Appeal from the Circuit Court for Harford County, In Equity (HARLAN, J.).

Bill by John Rodgers against Ethel G. Rodgers. From a decree for plaintiff, defendant appeals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*John L. G. Lee* and *Alexander Preston,* with whom was *R. Contee Rose* on the brief, for the appellant.

*Thomas H. Robinson* and *Stevenson A. Williams,* with whom was *Fred R. Williams* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the Court.

The appellee, on the 26th of November, 1920, filed a bill of complaint in the Circuit Court for Harford County for a divorce *a vinculo matrimonii* from the appellant on the ground of abandonment, which is alleged to have occurred on or about the first of December, 1914.

The bill states that the parties were married in Annapolis, Maryland, on the 13th of January, 1912; that they lived to-

gether as man and wife until about the 1st of December, 1914, and that while living together, the conduct of the plaintiff towards the defendant "was always kind, affectionate and above reproach." It further alleges that they had one child, a daughter, who was seven years old on the 24th day of July, 1919, and resided with the defendant at Newport, Rhode Island, and that because of her youth, and the fact that the plaintiff was an officer of the United States Navy and compelled to spend a considerable part of his time away from home, he was willing for her to remain in the custody of the defendant, provided that he might have the custody of the child for a reasonable time each year.

The defendant's answer admits the marriage, and that the child was living with her, but denies the other averments of the bill, and particularly denies that the defendant deserted or abandoned the plaintiff.

The evidence shows that at the date of the marriage the plaintiff was under orders to go to California, that he and the defendant arrived there about two weeks later and lived in a cottage in Corona, near San Diego, about four months; that he was called to Annapolis about the last of April and they lived there in the house owned and furnished by Mrs. Greiner, his mother-in-law, until August 5th, when he received orders to command the fleet tender Yankton; that he remained on the Yankton until October of the same year, when he was ordered to the battleship Nebraska, attached to the Atlantic fleet, and remained on the Nebraska until September, 1913; that after the plaintiff was orderd to the Yankton, the defendant remained in Annapolis about two months, and then went to the home of the plaintiff's father, in Harford County, Maryland, from there to Philadelphia to visit her mother, and from Philadelphia to Newport, Rhode Island, where she and her mother took a cottage; that during the time he was on duty on the Yankton and Nebraska the defendant visited him at New York, Hampton Roads and Newport; that after the Nebraska returned from Mexico in

1913, and while she was at the Navy Yard in Boston, which was about a two hours' ride from Newport, the plaintiff visited the defendant at her cottage in Newport every week end that he could get off for about two months, and after that about every ten days until the Nebraska sailed in September, 1913; that he was transferred at Hampton Roads to the gunboat Paducah and did not see the defendant again until September, 1914; that the Paducah arrived in New York from Mexico the latter part of August, 1914, and from there went to Portsmouth, New Hampshire, where she and the plaintiff remained until about the middle of February, 1915. The plaintiff further testified that after his vessel arrived in Portsmouth in September, 1914, he went to see the defendant every time he had an opportunity—nearly every week end, until she "took action against him in October of that year, and that during the period from his marriage to October, 1914, he contributed one hundred dollars per month to the support of the defendant and his child. As to what occurred in Newport in October, 1914, the plaintiff testified as follows: "The first interruption (in their relations) occurred once when I made a trip to Newport, having informed Mrs. Rodgers that I was coming. When I reached the house she and a friend were setting the table for supper. She greeted me like this: 'What are you doing here? I telegraphed you not to come.' " After saying that they had no argument that evening, he said: "I think I remained at the Hotel Perry that evening. I am not sure what occurred after that on that visit. I know that I returned to the Paducah the next day. My next visit was approximately two weeks later. I think it was about the middle of October of that year. On the Sunday of that visit I asked Mrs. Rodgers (the defendant) to take an all-day ride in an automobile, and when she came out to get in the automobile—it was a small flivver about like a Ford—I said: 'It is a fine day, let us both try to see if we can't have one day without trouble, without a row,' is what I think I said. So far as I know we never had a day in our

married existence without some sort of ruction—I don't
recall one now." He stated that he did not receive the tele-
gram referred to telling him not to come, but that when he
got back to the ship the captain handed it to him.    When
asked to go ahead and tell about the automobile ride on Sun-
day, he said:  "To expand on my answer to that question,
why, I said that during the period of time that I have re-
cently described, from the time of the arrival of the Paducah
in New York, when she declined to come to New York, until
the time we started to take that automobile ride, I had been
doing everything that I could to overcome the disagreeable-
ness of our relations; during that period she had been par-
ticularly disagreeable.   At the time of the ride we seemed
to be getting together more than we ever had before.  There-
fore I was in hopes that we had reached some sort of satisfac-
tory understanding.   I was very anxious to continue it and
have a pleasant day that day.  She agreed to do her part in
making it a pleasant trip.   I think it was about 10 o'clock
when we started out and we lunched—had rather a pleasant
lunch at Stone Bridge.   The ride continued on and was very
agreeable to me until about 4 o'clock that afternoon, when
the subject of home came up.   I do not remember what
started that subject, but I do remember distinctly telling her
that she should be at Zion Hill—my father's home—with
the child, where the child could get the benefit of the country
air and other advantages instead of being cooped up in a little
house in Newport.   In answer to this she made a vituperative
and extremely disrespectful and insulting remark regarding
my mother.   She said she didn't want to live at my father's
place, that it was a dirty place and the servants were not
efficient, that she didn't like my mother and didn't want to
associate with her.   That is all that she said, and I said, 'Shut
up, or I will ditch the car.'  We were then going down a long
hill, and I put my foot on the accelerator.   The car jumped,
and she screamed, 'Remember the child,' and I remembered
the child and took my foot off.   She said, 'Let me out of the

car,' and I said, 'No, we are going to continue on'; but she started to get out herself—this was sometime afterwards when the car had slowed down. When the speed of the car slowed down, she got out on the runningboard. I felt convinced that she would not jump, but I found that she was putting her foot over the runningboard with the apparent intention of rolling off. Then I reached down and grabbed her by the coat, and pulled her into the automobile. I think I tore her coat, or tore a button off at that time. Then I got her back in the car and we went to the bottom of the hill. I stopped the car there to fix the engine, and when I looked up from my engine I saw she was out of the car. I told her to get back in the car and she refused to do so. I knew she had no money, and I offered her some change so that she could go back in the cars. Mrs. Rodgers refused to take the money, and I took her by the arm and forced or led her around to the car, and pushed her in—she didn't resist but held back. I was about to get in the car when some one came up back and attracted my attention. I turned and as I did so she got out. When I turned around, she had gotten out of the car and gone down to the bridge. I got in the car and went to the other side of the bridge with the intention of leaving her there, but I thought that would not be right. Several cars went by and then a runabout with a young man in it came along. She stopped it. She got in and they went off and I followed. When I reached home, it was almost time for my train to leave. I went in and told Mrs. Greiner—her mother—what had happened, then I had to run for my train. * * * I went back to the ship, and I was very much disturbed and disappointed with myself in having so far lost my control as to frighten Mrs. Rodgers, as I unquestionably did. When I got on ship, I wrote a letter to her mother—feeling in view of her attitude that she did not want to hear from me. That enclosed a check for two hundred dollars, and my answer to that letter was a communication from a lawyer by the name of Mr. Mahoney in Newport, and he said he wished to see me in

regard to my behavior to my wife. I went to Newport as
soon as I could to see him. Mr. Mahoney, after discussing
the situation for some time, stated that Mrs. Rodgers was
filing a petition for a separation with the idea later on, when
she became a legal resident of Newport, that she would get an
absolute divorce." After stating that Mr. Mahoney also told
him that his wife wanted one hundred and fifty dollars per
month alimony, and the custody of the child, he said: "I
tentatively agreed to everything except the one hundred and
fifty dollars per month, and asked Mr. Mahoney if he could
give me the name of an attorney who could work with him
amicably in this case and bring it to an easy settlement. He
gave me the name of Mr. William Williams, and I went to
see Mr. Williams." When asked if he saw Mrs. Rodgers
subsequent to that, he said: "I was called on the telephone,
and she said she wanted to see me. It was less than a week
from the time I was served with the papers. She said, 'Can
I see you?' and I said, 'Yes.' She said, 'Where?' and I said,
'I have made an arrangement to go to a football game today
with a party, and, if you wish, you can join the party in
Boston.'" He then testified that the defendant accordingly
met him in Boston, went to the game, then to the theatre and
then to their room in the hotel, where he and the defendant
spent the night together and remained until the following
afternoon. After testifying to a conversation with her, which,
he says, she opened up, and said how miserable she was, that
she couldn't stand the publicity she was getting, and in which
she "took the responsibility for everything that had hap-
pened" in their married life and asked him to forgive her and
take her back, he said further, "For some reason Mrs. Rod-
gers was extremely anxious to come to Portsmouth with me.
* * * On this occasion, for the first time, she was anxious to
come to Portsmouth. I said that she was to go back to New-
port, and I would go back to Portsmouth, and after arriving
there I would let her know whether to come or not. On my
way back, I recalled that Mrs. Rodgers had said that she had

no intention of getting an absolute divorce—only a separation, and she explained that she was getting that because she was afraid that I would come and kill her on account of the things she had said about my mother. At the time the difference in the statements between her and Mr. Mahoney made no difference to me, as I was not then concerned in what she had done, but what she was going to do. I realized now that an important part of her statement was at issue—that there was a difference in the statements, and that either Mr. Mahoney or she had told a falsehood. I did not see how I could continue to go on with her until that difference in statements was definitely straightened out. * * * I went to Newport on the first opportunity. I arrived there on Sunday evening—I think it was December 1st or 2nd, 1914. I met Mr. Mahoney on the platform of the station and told him I wanted to see him at No. 46 Mann Avenue, where my wife was living." He then said that Mr. Mahoney said he would come over that evening, and that he, the plaintiff, then went to see Mr. Williams and asked him to come to the meeting, after which he went to his wife's house. He further testified as to what occurred there that evening as follows: "I remained in the house with my wife and played with the child and talked to her. At that time her attitude was not conciliatory, to say the least, she was reserved. When the appointed time came— I think it was about 6 o'clock in the evening—anyway it was after dark, Mr. Williams and Mr. Mahoney arrived. I said to Mr. Mahoney that he had told me that Mrs. Rodgers ultimately intended to get an absolute divorce. Then turning to Mr. Williams, I said, 'Tell him what he told you,' and Mr. Williams told Mr. Mahoney the same thing. Mr. Mahoney flatly denied it, and said that Mrs. Rodgers never had any such intention—she was only going to get a separation. I said, 'Very well, Mr. Mahoney, that is all I wanted to know; but I have told my family and my friends that Mrs. Rodgers was going to get a divorce, and it will be some assistance to me to straighten this matter out and deny it if you will give

me that statement in writing.' Mrs. Rodgers then said, 'I don't care to have it straightened out—let it go the way it is,' and so I never got the statement from Mr. Mahoney. It was then approaching my train time, and those two men left. I was preparing to leave, and turned to Mrs. Rodgers and said, 'I am very sorry that this thing occurred, and I hope it won't make any difference.' She said, 'It is no use, we can't get along together. Your ideas and mine on honor and fundamental things are entirely different.' I said, 'Then you didn't mean the things you said to me in Boston?' She said, 'Yes, I meant them when I said them but I have changed my mind now.' I said, 'Then you mean you want me to go and stay?' and she said, 'Yes,' and I said, 'Very well.' I tried to kiss her good-bye but she held me off. Then I took my coat and hat and went to my train, and have not spoken to her since that time." On cross-examination he described the dangerous character of the road where he and his wife had the difficulty on that Sunday automobile ride, and testified that he did not on that occasion threaten to kill her. When asked if he did not have a telephone conversation with his wife after he got back from their trip to Boston asking him to send her the money, &c., for her trip to Portsmouth, he said he had a very dim recollection of it, and that he simply said to her, "I am not going to have you and that I have written you a letter or will write one."

We have set out the testimony of the plaintiff at some length because it is the only evidence upon which he relies, or can rely, to establish the alleged abandonment by his wife. The defendant's version of what occurred on that automobile ride in October, 1914, is somewhat different. She says: "He had told me often before that his mother did not care for me, and I had been trying to make the best of things. He got cross when I said I wouldn't go there to live. I said, 'I can't go because I can't live like that with the baby.' He said, 'You have just got to go,' and I said, 'I can't.' Then he started to curse and get angry and say I was saying things

against his mother. He started the car and said, 'I will just
kill both of us and get rid of it that way,' and he made for
the stone bridge. I pleaded with him to please remember
the baby, and not to do a thing of that sort, but the car was
going faster and faster, and I tried to get out of the car. I
wanted to get on the runningboard, get off and come home on
the trolley cars. When he came to the trolley cars he had to
slow down, and then I got out on the runningboard and got
out—fell out. Then I got up and started to run along the
road, I was terrified and was screaming. He said he was
going to kill me and he cursed and swore. I was running
across the bridge, and saw a runabout coming up the grade
and it started across the bridge. I thought it was Dr. Sulli-
van, and I ran towards it. It was not Dr. Sullivan, but it
was Dr. DuBois. I asked him if he would take me home and
he said that he would. * * * He took me to Newport—took me
home, and Dr. Sullivan was sent for that night. He came
up to the house and Commander Rodgers (the plaintiff) fol-
lowed him in the car, but did not come up to the house. Then
Dr. Sullivan came." She further testified that the bill for
a separation was drawn up as a result of a conversation be-
tween the plaintiff and Dr. Sullivan, and was brought to her
and she signed it; that the arrangements were that the pro-
ceeding was to be "done quietly"; that afterwards she be-
came very much upset by reporters coming to the house to
inquire if she was getting a divorce; that she could not under-
stand it as it was understood that the proceeding for a separa-
tion was to be conducted quietly, and that no one was to know
it but Mr. Rodgers and herself, and that she called up the
plaintiff to ask him to come to Newport "in regard to it";
that he said that he had an engagement in Boston the next
day, and that she could come there if she wanted to; that
she went to Boston to see him, and after the football game,
and the theatre, and his friends had gone, she told him about
the reports that had gotten out about the separation; that he
said he didn't know how it started, but that he had told his

mother and father and had mentioned it "at mess"; that she told him that as long as he had spread the story, he should say that she did not hate him and that she thought the thing ought to be stopped, and that she was going back to Newport to get the baby and nurse and go to Portsmouth with him, and that he said he thought it was a good idea; that she wanted to be with her husband and to show people that the reports were not true; that the next afternoon he took her to the train for Newport, and that she told him that she was going to get the baby and nurse and 'everything' and come to Portsmouth, and that he told her that he would send her the directions how to get to Portsmouth, and the tickets, money, &c.; that she waited in Newport three or four days for the things to come, and then called him up on the telephone and told him that she was all ready to come, but that she had not received the directions and tickets, and that he said, "I don't want you here and that is all that is in it." She denied that she made the statements to the plaintiff that he testified she made on December 1st, 1914, after Mr. Mahoney and Mr. Williams left the house, and when asked: "You came back to Newport to get the child and go to Portsmouth as had been agreed with your husband?" she replied, "I suggested doing so, and he seemed to be glad to have me do it. I didn't want that unpleasant thing to get about as I never intended to get a divorce—never myself. He had talked about something that happened on the Nebraska which was very unfortunate, and for his sake, if for nothing else, I still intended to try to get along with him."

The proceedings referred to, and which were dismissed in consequence and pursuance of their reconciliation in Boston, were produced in evidence, and they show that the petition of the defendant was for a decree for a divorce "from the bed, board and future cohabitation with the said John Rodgers until the parties shall become reconciled," that it was filed on October 31st, 1914, and entered "Discontinued" on November 4th, 1914.

Md.]

The evidence shows that the plaintiff had ceased to care for the defendant long before October, 1914. As early as November 3rd, 1912, less than a year after their marriage, he wrote her as follows:

"U. S. S. Illinois, Navy Yard, Boston,
                "November 3rd, 1912.

"Dear Ethel: I have written several long letters to you, all of which I have torn up, and will condense to 'wishing you as much happiness as you can get out of this world without any expense to anybody else.' Get the car fixed up and have your brother teach you; all you need now is practice.

"Also, don't believe that, because I am trying to be decent to you, I love you any more, because I don't— and never will.

"Yours,

"J. R.

"P. S.—I don't love you, not because I don't want to, as you seem to think; but because I can't. I want to with all my heart, but I can't—I can't."

And the same attitude towards his wife is shown by the letter, which he testified he wrote her mother, who was living with her, immediately after he got back to his ship after that automobile ride in October, 1914, in which he says, among other things:

"Remember that Ethel has always my unbounded admiration for her absolute honesty and aversion to any pretense whatsoever—her ideas of life and how to live, her cleanliness of mind and habits, her artistic taste in all things, her great depth of feeling and devotion, her beauty and sweetness, her efficiency in both mind and body, the agility of her brains and fingers, her power of concentration and, most of all, her efficient devotion to her baby and to duty. For me she had a real test of character in California, showing in those terrible days the stuff she was made of and her superiority over me.

"But, realizing all these things and knowing probably better than anyone else what she is worth, I cannot feel any real love for her. There is always the impression in my mind that she has only her own and none of my interest at heart. Remove this feeling from me, and I believe I should become her devoted husband in every sense of the word."

Whether the unfortunate occurrences on the automobile ride referred to, and the bill for a legal separation that followed, were the result of the attitude of the plaintiff expressed in these letters it is not necessary for us to decide, for the evidence shows conclusively, as least so far as the defendant is concerned, that the parties became reconciled while on that trip to Boston a short time afterwards, and that the proceedings for a separation were promptly dismissed in consequence of that reconciliation and the agreement of the parties to live together in Portsmouth. And it is admitted that the first breach in their relations after that reconciliation was the positive refusal of the plaintiff to permit the defendant and their baby to come to Portsmouth to live with him in accordance with the understanding reached in Boston. Even if we assume that the plaintiff was, under the circumstances, justified in demanding from Mr. Mahoney the written statement mentioned in his evidence, the evidence of what occurred between the plaintiff and defendant at her home on the evening that Mr. Mahoney and Mr. Williams met him there after Mr. Mahoney and Mr. Williams had left rests entirely upon the plaintiff's testimony. She positively denies that she said what he says she said, and his testimony in that important particular stands without any corroboration by the other evidence in the case. The evidence further shows that while the plaintiff has visited his child on a number of occasions since, he has never made any effort to see his wife nor any real effort to effect a reconciliation. Under such circumstances we cannot hold that the defendant abandoned the plaintiff. In the case of *Gill* v. *Gill*, 93 Md. 652, this Court

said "that abandonment, to constitute ground for a final divorce, must be the deliberate act of the party complained of, done with the intent that the marriage relation should no longer exist," and the same statement is repeated in *Twigg* v. *Twigg*, 107 Md. 676. In the case of *Tomkey* v. *Tomkey*, 130 Md. 292, JUDGE URNER, speaking for the Court, said: "No proof has been adduced in confirmation of the plaintiff's statement that when his wife returned to Greece it was with the intention to remain there permanently and with the suggestion to him that he might continue to live in America. Even if this were assumed to indicate a purpose on her part to terminate her marital relations with the plaintiff, we could not accept his unsupported testimony as a sufficient basis for a decree of divorce upon the ground alleged. It is provided by section 4, article 35 of the Code that no divorce shall be granted 'upon the testimony of the plaintiff alone, but in all such cases testimony in corroboration of that of the plaintiff shall be necessary.' In order to procure a divorce, under the allegations of the bill of complaint, it was incumbent upon the plaintiff to prove that the defendant deliberately left him with the intent to bring the marriage relations to an end, that the separation thus occasioned has continued uninterruptedly for the statutory period of three years, and that there is no reasonable hope of a reconciliation being effected. * * * In view of this fatal deficiency in the proof, it is clear that the decree of the court below dismissing the bill would have been proper even in the absence of any defense to the suit, but the propriety of such a disposition of the case is emphasized by the fact that the wife is opposing a divorce, and in effect, charges in her answer that the plaintiff is himself responsible for the present separation." See also *Bounds* v. *Bounds*, 135 Md. 220.

It follows from what has been said that the decree of the court below granting the plaintiff the divorce prayed for in his bill must be reversed, and the bill dismissed.

*Decree reversed, with costs, and bill dismissed.*