GEORGE V. SIMMONT *v.* EVA B. SIMMONT.

[No. 1, January Term, 1931.]

*Decided February 19th, 1931.*

424

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*W. Le Roy Ortel,* for the appellant.

*Arthur R. Padgett,* with whom was *Edwin J. Wolf* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this proceeding were married on July 21st, 1916, and lived together as husband and wife until August 17th, 1929. On that day the husband, George V. Simmont, left the common domicile, and since then has lived apart from his wife. On October 22nd, 1929, Mrs. Simmont filed in the Circuit Court of Baltimore City her bill of complaint against her husband, in which she alleged that he had abandoned and deserted her; that the abandonment was deliberate, final, and beyond any reasonable expectation of reconciliation; that, while her husband earned $35 per week, she, except for $8 per week which he paid her for the support of herself and her infant child, was destitute, and she prayed that she be declared to be entitled to receive by way of permanent alimony an allowance of her husband's estate proportioned to his earnings and station in life. The defendant in his answer admitted the marriage, and admitted that he did earn $35 per week, but denied the desertion, and on October 29th, 1929, he filed a cross-bill charging his wife with adultery, praying an absolute divorce, and asking for the custody of their two minor children. She denied the charge of adultery, the case was tried on those issues, and

at the conclusion of the trial the chancellor granted the relief prayed in the original bill, and dismissed the cross-bill.

This appeal from that decree presents three questions: (1) Was the evidence sufficient to support the decree for permanent alimony? (2) Did it support the husband's charge of adultery? and (3) Was the decree in proper form?

It is the settled law of this State that a decree for permanent alimony may not be granted except upon grounds sufficient to support a decree for a divorce *a vinculo matrimonii* or *a mensa et thoro*. *Outlaw v. Outlaw*, 118 Md. 498, 84 A. 383; *Silverberg v. Silverberg*, 148 Md. 691, 130 A. 325; *Melson v. Melson*, 151 Md. 205, 134 A. 136; *Wendel v. Wendel*, 154 Md. 20, 139 A. 573.

There is no contention in this case that the husband has been guilty of conduct which would entitle the appellee to a divorce *a vinculo matrimonii* from him, but she rests her claim to relief solely upon the charge that he abandoned and deserted her without just cause. And, since "abandonment and desertion" are sufficient to justify a divorce *a mensa et thoro* (Code, art. 16, sec. 39), that charge, if proved, is sufficient ground for a decree for permanent alimony.

The phrase "abandoned and deserted" has repeatedly been construed and interpreted by this court, *Buckner v. Buckner*, 118 Md. 113, 84 A. 156; *Muller v. Muller*, 125 Md. 76, 93 A. 404; *Hubbard v. Hubbard*, 127 Md. 620, 96 A. 860; *Polley v. Polley*, 128 Md. 62, 97 A. 526; *Crouch v. Crouch*, 150 Md. 608, 133 A. 725; *Miller v. Miller*, 153 Md. 213, 138 A. 22, and has uniformly been held to mean an actual severance of the matrimonial cohabitation, coupled with a fixed and deliberate intention on the part of the offender to terminate the marital relation. And, where such a separation was not caused by any default or wrongful conduct on the part of the one abandoned, and where there has been no offer by the erring spouse to resume cohabitation, made under such circumstances as would warrant a reasonable belief that such relations could be resumed without endangering the health or reasonable comfort of the innocent spouse, it is sufficient ground for either a divorce *a mensa et thoro* or

permanent alimony. *Schwartz v. Schwartz,* 158 Md. 80, 148 A. 259.

It is undisputed that the appellant actually left the common domicile, so that appellee's right to the relief prayed in her bill depends upon (a) whether his abandonment was justified (*Nickel v. Nickel,* 150 Md. 702, 137 A. 915) ; and (b) whether she wrongfully refused to resume the suspended cohabitation. *Downs v. Downs,* 154 Md. 430, 140 A. 831.

While the evidence relevant to the first of those issues is not wholly convincing, the proof offered by the wife was sufficient, if uncontradicted, to show that Simmont in fact, without sufficient justification, actually left the common domicile with the fixed and deliberate intention of terminating marital relations with his wife, and the burden was then upon him to go forward and overcome that proof by showing that he was justified in such abandonment. *Keezer on Marriage and Divorce,* sec. 511; *Hamilton v. Hamilton,* 87 W. Va. 534, 105 S. E. 771. The chancellor decided he did not do that, and while, as he had both the parties and the witnesses before him, his finding on that issue of fact, which depended so largely upon the relative credibility of the witnesses, should not be lightly disturbed (*Gimbel v. Gimbel,* 148 Md. 187, 128 A. 891; *Sporrer v. Ady,* 150 Md. 70, 132 A. 376; *Pattison v. Brydon,* 150 Md. 584, 133 A. 328; *Moran v. O'Brien,* 156 Md. 222, 144 A. 257), yet it is in no sense conclusive, and, where it is clearly erroneous, it will be set aside. *Moran v. O'Brien, supra.*

While there were mutually recriminatory charges of abuse, offensive language, threats, and even personal violence, made by the parties in the pleadings and the evidence, it is sufficient to say that the evidence failed to support them, and they may be disregarded. The substantial grounds upon which Simmont relied as an excuse for his abandonment of his wife were: (1) That she was improperly intimate with one William Raleigh, and that charge is also the basis of his cross-bill; and (2) that she had abandoned and deserted him, Simmont.

Raleigh and Simmont met for the first time in a barber shop in 1926. Simmont was employed by James S. Stallings, a public weigher, and Raleigh was by occupation an upholsterer. They were both married. Raleigh had three children and Simmont two, and they seem to have lived in the same neighborhood. From the first, Raleigh and Simmont appear to have been drawn together by a common interest in religion. Raleigh professed to be an "evangelist," and Simmont, while he did not offer himself as a teacher or a preacher of religion, took a somewhat active part in religious work, and, although he is said to have been a "Catholic," at one time or another, aided in the work of Baptist and Congregational churches and also the evangelistic work of Raleigh. Shortly after he met Raleigh, he invited him to preach "at a Congregational Church" in Canton. Later he met him again at a "Revival Meeting" at a Baptist mission. As a result of the friendship between the two men, their families were often together, they became friendly and even intimate, and on one occasion, when Mrs. Simmont was ill, Mrs. Raleigh attended to her work for about a week, and then Mrs. Simmont was carried to the Raleigh home, where she remained for about five weeks longer.

Finally, in February, 1928, the Simmont and Raleigh families moved together into a house in Canton, which they used both as a dwelling and a "Mission." The following description of the property is accurate: "The lower floor and the two front rooms on the second floor were occupied by William Raleigh and his family. The rear rooms of the second floor and all of the third floor were occupied by the Simmonts. The store front was used by a Gospel Mission in which both families were interested. A stairway led from the center of the first floor to the center of a hall leading along the whole east side of the second floor. The stairway to the third floor led from the front end of the hall on the second floor adjacent to the bedrooms of the Raleighs (the two front rooms on the second floor). There was also a stairway from the front directly to the second floor landing on the said second floor hall." Appellant's brief.

For a time the two families lived there in apparent harmony. Simmont aided Raleigh in conducting the mission, the two wives assisted each other in their respective household duties, and the relations between the families became very informal and intimate. Eventually, however, discord crept in. Quarrels and fights between the children led to differences between the parents, the evangelical activities of Raleigh palled on Simmont, and he went elsewhere for spiritual comfort, and at the same time began to view with jealous disapproval the growing intimacy between his wife and Raleigh, and eventually, according to the testimony of Raleigh, Simmont formed a liason with another woman whose importunities threatened to disrupt his relations with his wife.

Simmont fixed the time at which the controversy between him and his wife, which culminated in their separation, began, as the early part of April, 1929. He testified that on April 3rd he came home from church at about 10 o'clock in the evening, and found his wife in Raleigh's kitchen crying; that on April 5th, when he came home from choir practice, he found the outer door fastened, and that when he rapped for admission Raleigh, who was partly undressed, came down and opened the door, and that he, Simmont, at once went to his wife's bedroom, and found her preparing for bed in the room with her little girl, who was in bed, and that his wife was "out of breath"; that, on June 6th, the witness said: "I snuck down and peeped through the keyhole and my wife was leaning over Mr. Raleigh who was then laying on his couch. She raised up and never even looked at me. She said to me, What do you want? I did not know how she knew it was me or anything about it. She asked me what did I want and I said I just wanted to see where you were"; that on April 13th, while Mrs. Raleigh was away from home, he saw his wife come from Raleigh's bedroom; that on another occasion he heard Raleigh ask her to "kiss him," and finally, that, on August 17th, when Mrs. Raleigh was leaving for a trip to Cambridge, Md., his wife placed in Raleigh's "ice box" some articles of food which she had bought on

Simmont's credit; that on the same occasion his wife went into Raleigh's dining room, which was dark, and, when he called her, she refused to answer him. After this last incident, Simmont packed his clothes, and with his son, Vernon, left the house, and since then has lived apart from his wife. Simmont further testified that he asked his wife to leave the Raleigh home, but that she refused to do so.

Simmont's testimony was corroborated by his son, Vernon, aged fourteen, who testified that on one occasion he saw his mother "go through" Raleigh's bedroom and heard them "talking and moving around"; Mrs. Lottie G. Taylor, aged sixty-eight, a visitor, who testified that on an occasion when Mrs. Simmont was ill in bed she found Raleigh sitting in a chair beside her bed with "his face in her face" as if they were talking with each other, and that on another occasion she saw Raleigh in his wife's presence grab Mrs. Simmont and rub her face with his face until she turned red, and that she gave him a paper bag, and he opened it and it had six small cakes in it she had baked for him; and Mary Myers, who said that, when Raleigh was sick and in bed, she found Mrs. Simmont, who was nursing him, sitting beside the bed with her elbow on his pillow, leaning towards him, and that on the next day, accompanied by Mrs. Raleigh and a "real old lady," she saw him again, and that on that occasion Raleigh, who was sick, pulled Mrs. Simmont's head down on his breast.

While much of that testimony was contradicted by Mrs. Simmont and Raleigh, it may well have been sufficient to show that Raleigh was improperly intimate with the appellee, but for these highly significant facts: The two families were in constant and intimate contact, and lived almost in common. The members of each went into the apartments of the other much as the members of a single family would; the women helped each other in the work which each had to do; when Mrs. Raleigh was absent from her home, at her request Mrs. Simmont at times helped keep the Raleigh apartment in order; at times they had meals together; when Mrs. Simmont was ill, the Raleighs nursed .

her; and, when Raleigh was ill, Mrs. Simmont aided Mrs. Raleigh in caring for his needs. Under such circumstances, familiarities which would ordinarily be regarded as offensive and improper took a different character, and their significance must depend in some measure upon the impression they made on the parties at the time.

Although Simmont in his cross-bill has charged his wife with having committed adultery with Raleigh, he never, except for that, either before or after their separation, charged his wife with having had improper relations with Raleigh, nor did he at any time intimate either to Raleigh or his wife that he suspected any improper intimacy between them.

And Mrs. Raleigh, testifying as a witness in the case, said that she has never seen anything "wrong," and did not believe there was anything "wrong" between them. That a husband, in daily contact with his wife for four or five months, could believe that during that entire period she was guilty of an adulterous relationship with an inmate of the house in which he lived without uttering a word of complaint to her or the supposed paramour is so improbable that it must rather be inferred that, at the time they occurred, he attributed no guilty significance to the incidents to which we have referred and of which he now complains. And that conclusion is strengthened by the fact that Mrs. Raleigh, who would also be wronged if the charge were true, saw nothing "wrong" in the relations between her husband and the appellee. Simmont, it is true, may have been a timid and complaisant husband, and Mrs. Raleigh may have been willing to shut her eyes to the obvious to keep her home intact. Nevertheless, after considering all the evidence, and giving the appellant the benefit of every reasonable doubt, it is not sufficient to overcome the *prima facie* presumption that the findings of the chancellor, who had the parties and the witnesses before him, were correct, and we find no error in the dismissal of the appellant's cross-bill.

Nor were appellee's relations with Raleigh in themselves sufficient cause to justify him in abandoning her. But they were sufficient to justify him in leaving the house which

Raleigh occupied, and his action in so doing cannot be characterized as desertion, if he offered to provide another home for his wife and children and share it with them, unless the change would have detrimentally affected their health, welfare, or comfort.

The evidence is sufficient to establish the fact that he did make such an offer and that she refused it. If that request was made in good faith and with a reasonable regard for the comfort, health, and welfare of his wife, her refusal to accept it not only justified him in leaving the home in which they were then living, but amounted to a desertion on her part (*Keezer on Marriage and Divorce,* sec. 338), and the duty then fell upon her of seeking a renewal of cohabitation. *Id.* The evidence leaves no doubt that the request was made in good faith, and that its acceptance involved no sacrifice of health, comfort, or welfare by the appellee.

Nor was there anything unreasonable in his request. For, while the evidence was not sufficient, under the rule laid down in such cases as *Totten v. Totten,* 150 Md. 701, 137 A. 916; *Cashell v. Cashell,* 153 Md. 170, 137 A. 904; *Wendel v. Wendel,* 154 Md. 11, 139 A. 573; *Lang v. Lang,* 155 Md. 464, 142 A. 485; *Swoyer v. Swoyer,* 157 Md. 18, 145 A. 190, to show an adulterous relationship between the appellee and Raleigh, it did show an intimacy between them which the appellant may well have resented. There was some effort to justify her refusal by showing that Simmont had himself been guilty of adultery, but the evidence was wholly insufficient to establish the charge. Mrs. Simmont also attempted to excuse her refusal on the ground that her husband had treated her cruelly, and that she was afraid to live in a house occupied by only him and their children. But the evidence does not support her in that excuse either, and she was unquestionably in fault in refusing to leave the Raleigh house and accompany her husband to another home. It cannot be said, therefore, that his act in leaving that house after her refusal amounted to desertion; for no reasonable conclusion can be drawn from the evidence but that he left his wife because he was unwilling to live any longer in the Raleigh

house, and that she refused to go with him because she preferred to remain with the Raleighs. Since their separation, the only attempt at reconciliation was made by Simmont, when at a magistrate's hearing he stated that he was willing to live with his wife again. She herself made no effort to effect a reconciliation, and her testimony leaves the distinct impression that she is unwilling to return to him. And while at the trial he said that, because she refused his offers to resume cohabitation, he never intended to live with her again, it cannot be said, in the absence of any evidence sufficient to support the inference that she would accept an offer to resume the suspended cohabitation, that his mere statement, made in answer to a question by counsel, was sufficient to change the status of the parties as it existed at the institution of the suit. Desertion is a continuing offense, and ordinarily, until it has by the efflux of the statutory period ripened into a complete cause for an absolute divorce, the duty rests upon each party to the marriage to accept any offer made in good faith by the other to resume suspended cohabitation, if it appears with reasonable certainty that such offer may be accepted without any reasonable sacrifice of self-respect, health, safety, or comfort. But that rule has no application unless such an offer has been actually made by one party and refused by the other. And, in the opinion of a majority of the court, a declaration such as that made by Simmont is a mere hypothetical statement of a future course of action predicated upon facts which may never exist, and not the refusal of an offer within the meaning of the rule. And, since Mrs. Simmont failed to meet the burden which she assumed of showing that the separation of which she complains is the result of any default or wrongful conduct on the part of her husband (*Hague v. Hague*, 84 N. J. Eq. 674, 95 A. 192; *Id.*, 85 N. J. Eq. 537, 96 A. 579; *Crouch v. Crouch*, 150 Md. 608, 133 A. 725), it follows that the appellee is not entitled to permanent alimony. *Keezer on Marriage and Divorce*, secs. 341, 338, 336; *Nelson on Divorce & Separation*, sec. 73 *et seq.*, sec. 68; *Rodgers v. Rod-*

*gers,* 142 Md. 561, 121 A. 249; *Taylor v. Taylor,* 112 Md. 674, 77 A. 133.

The decree awarded the custody of the infant daughter of the parties to the appellee and the custody of their infant son to the appellant, but contains no provision for the support of the daughter. The jurisdiction of a court of equity to deal with the custody of children of parties to cases in which a divorce is denied has been the subject of a sharp and irreconcilable conflict in the decisions in other jurisdictions. 9 R. C. L. 473; *Horton v. Horton,* 75 Ark. 22, 86 S. W. 824; *Thomas v. Thomas,* 250 Ill. 354, 95 N. E. 345. In this state, in *Murray v. Murray,* 134 Md. 653, 107 A. 550, the jurisdiction was denied, but, as pointed out in *Hood v. Hood,* 138 Md. 364, 113 A. 895, 898, immediately after that decision section 38 (now section 39), article 16, Code, was amended so as to provide that courts of equity "shall also have power in all cases in which the care and custody of the children of parties forms part of the relief prayed whether a divorce is decreed or denied to order and direct who shall have the guardianship and custody of the children, and be charged with their support and maintenance and may at any time thereafter annul, vary or modify such order in relation to the children." Whether that language is broad enough to cover a proceeding for permanent alimony need not now be considered, since in this case the appellant in his crossbill prayed that he be divorced *a vinculo matrimonii* from the appellee. In our opinion, therefore, by virtue of that statute, the court had the power to determine the custody of the infant children of the parties, and was under the duty of directing that suitable provision for their support and maintenance be made.

The action of the court, with respect to the custody of the children, upon the whole case appears to be consistent with their best interests, and we see no reason to disturb it. But the decree is defective in failing to require the appellant, who is naturally and primarily chargeable with her support, to provide for the maintenance of his infant daughter.

434

In view of the conclusion we have reached upon the merits of the case presented by the appeal, it is unnecessary to consider the peculiar form of that part of the decree which awards permanent alimony to the appellee.

So much of the decree as awards permanent alimony to the appellee will for the reasons herein stated be reversed; in all other respects it will be affirmed, and the case remanded that an order may be passed requiring the appellant to make suitable provision for the support and maintenance of his infant daughter.

*Decree reversed in part and affirmed in part, and case remanded for further proceedings in accordance with the views expressed in this opinion, with costs to the appellee.*