# PHILIP MILTON KIRKWOOD *v.* ETHEL M. KIRKWOOD.

[No. 80, October Term, 1933.]

*Decided January 16th, 1934.*

The cause was argued before BOND, C. J., PATTISON, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*William W. Powell,* for the appellant.

*Jacob Blum,* with whom were *Eli Baer* and *Louis Peregoff* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The plaintiff, Ethel M. Kirkwood, began on February 27th, 1933, a suit against her husband, Philip Milton Kirkwood, for permanent alimony, and an allowance of temporary alimony *pendente lite* and counsel fees. The ground alleged for relief was a constructive abandonment of the wife by the husband. The specific charge was that the defendant had failed to support the plaintiff since December 28th, 1932,

and had by his acts and conduct forced her to leave the marital domicile on January 4th, 1933. The answer of the defendant was an emphatic denial of the accusations made by the bill, and an extended presentation of his defense. The parties took their testimony in open court, and the chancellor passed a decree awarding the plaintiff permanent alimony, counsel fee, and costs. An appeal was then entered.

The marriage of the parties was on October 6th, 1920, and the wife left her husband on January 4th, 1933, and did not return. Upon their marriage the couple went to the home of the father of the groom to live. After the death of the father in 1923, they continued to live with his widow until their final separation, when the three were the only occupants of the house.

The wife left the home in the husband's absence while engaged in the service of his employer. She attempted to justify her departure by charging that her mother-in-law was disagreeable, that their household and domestic customs were not to her taste, but that the husband had declined to provide her with another home, and had refused her sexual intercourse for a period of eight months before she left, and that he was uncivil, reticent, and unsociable, and came home drunk once a week, and that he and his mother had frequently told her to leave. The husband denied the wife's testimony, which was not consistent, that he had refused his wife's embraces, and stated that there had been no interruption in their sexual intercourse until she left. There was no testimony supporting the wife's charge in this respect, and the accusation is not proved. *Owings v. Owings,* 148 Md. 124-127, 128 A. 748. The other charges are either unsubstantiated by the testimony or insufficient as a basis for divorce, and, being unwarranted, were vexatious in their nature. The mother is seventy-five years old and owned the property where they lived. The husband is her only child. It was by the united effort of the three that the home was maintained. The husband earned a small weekly wage, and could not have provided his wife with a different home, if the circumstances had indicated such a necessity. The

household had been the same for twelve years before the wife left, but in the fall of 1931 she began to display a dissatisfaction with her married life. On January 5th, 1932, she went away while her husband was at work and in a note she left enjoined her husband not to look for her and added that she had gone for good. The husband did not know where she was and on January 29th had it announced by radio that she was missing, and he received a letter written on that night from her, informing him that she had heard the radio message and that he knew she had left him and would not be back. She returned, and left on March 6th 1932, came back the next day, and went away on March 11th. Her husband did not see her again until May 4th, when she casually met him and asked for money, which he declined to give, but said that she should come back, and this she did on May 7th. After this resumption of the marital state, the testimony is that the wife was absent quite often after August on brief visits until she left him a second time, as she phrased it, "for good," on January 4th. Her testimony is that on January 5th, again on the 7th, she called her husband on the telephone. Her husband admits the two calls by telephone, and declares there was a third. The wife states that she called him to the telephone in an effort to effect a reconciliation, and that the husband refused, but his statement is that he declined to discuss the matter over the telephone, but informed her that he would do so at any place she might designate, and that she would not agree. The wife corroborates her husband that he refused to talk with her on the telephone, but denies he promised to meet her according to her choice. Without the two meeting for discussion of their situation, the bill was filed at the end of the next month.

When the plaintiff first testified, the chancellor inquired of her if she would be willing to return, and her reply was that she would, if her husband would provide another home for her away from his mother. To a similar inquiry, the husband said that he did not want to take her back, and he further testified that she had left him so often he had lost all confidence in her. At the closing by both sides of their final

testimony, which had been given after an interval of nearly two weeks because the chancellor had adjourned the hearing to afford the parties an opportunity for reconciliation, the chancellor first called the wife to the stand, and, among other questions, asked her what her attitude was with reference to returning. At first, her answer was she was willing to go back, if he provided another home, as she did not want to return to his mother's home; but, finally, after having had pointed out to her by the chancellor that she had lived there under similar conditions for twelve or thirteen years, she, with evident reluctance, said she thought she would be willing to make another trial in the mother's home. The husband then was recalled and had propounded to him the same interrogatory, and his reply was that he did not want her back, because of his loss of confidence on account of her having left him so often. It will be observed that neither the wife nor the husband definitely agreed or declined to resume their marital relations, although the chancellor had given them an interval of two weeks in which to become reconciled or to reach a definite conclusion.

The record does not disclose any sufficient reason for the wife to leave her husband's home, which was, through the co-operation of the husband's mother, assured, comfortable, adequate, and suitable, comported with their station in life, and afforded them every opportunity for privacy and entertainment. The evidence does not establish that the mother-in-law's conduct or presence militated in any appreciable degree against the happiness and tranquility of their domestic life. *McClees v. McClees,* 160 Md. 120, 152 A. 901. The husband had given to his wife every week, for the table and clothes for both, seventy-five *per centum* of his small weekly wage, and his mother's contribution was the home, without rent, and the assumption of the payment of the bills for fuel and taxes.

It is undoubtedly true that, if one spouse leaves the other without cause, as in the present instance, and repents and proposes to renew the cohabitation, and that other refuses, it constitutes desertion by the one refusing from the time of the refusal, provided the offer to return is made in good

faith, and is free from improper qualifications and conditions, and is really intended to be carried out in accordance with the performance of the duties and obligations of the matrimonial cohabitation. *McClees v. McClees,* 162 Md. 70, 74, 75, 158 A. 349; *Simmont v. Simmont,* 160 Md. 422, 432, 153 A. 665; *Wise v. Wise,* 159 Md. 596, 598-600, 152 A. 230.

The erring spouse in the instant case testified in chief that the day after she departed from her husband's home she sought a reconciliation by calling her husband on the telephone and asking him twice if he wanted her back and if he would give her another key to the front door, and he refused. On her re-examination, her version of the conversation varied, and was, "I called him up the second day and told him if he would give me the key I would come back, but he refused." In all these calls by telephone, the wife was in Baltimore. There is a ring of insincerity in a protestation of the desire to effect a reconciliation when attempted by a conversation carried on by means of a telephone. A contrite wife, who had wronged her husband by leaving his side without justification, not only had a right but the duty to go back home. Her husband's permission was not requisite. Whether he desired or was unwilling to have her back, it was his marital obligation to resume his marital relations upon her return, and the proper way for her to test his attitude was to go home. The husband's refusal to discuss the matter on the telephone was reasonable, and he asserts that he informed his wife that he would meet her at any place that she would choose for their interview. He was not the erring spouse and so was under no duty to seek his wife. While she denied that her husband had told her he would meet her, she does say that he refused to discuss the question over the telephone. The wife did not go to her husband's home, nor did she ever make any effort to see him, but in less than two months after she left she began a suit for permanent alimony. Her own evidence was at first to the effect that her willingness to return was conditioned on the unreasonable requirement that her husband provide a home from which his old mother should be

excluded. She had no right, under the circumstances shown by this record, to make this exclusion a condition precedent. *Ewing v. Ewing*, 154 Md. 84, 140 A. 37. Her further testimony, when recalled at the closing of the testimony by the chancellor, was to repeat her terms of return, but, finally, the utmost she could be induced to yield was her statement, not that she would return to her husband's and his mother's domicile, but merely, "I think I would." The effect of her testimony is convincing that, both before the filing of the bill and on the hearing, she had made no offer to return in good faith and free from improper qualifications and conditions. *Supra.* Moreover, the quick abandonment of any action to recover her marital status, and the haste with which she began her suit for permanent alimony, the unfounded and reckless charges which she preferred, over her signature and under her oath, and her previous abandonment of her husband, serve to fortify this conclusion. The wife, therefore, has never made such a request nor offer to resume her marital state that refusal to receive her would constitute a desertion by the husband.

Another phase of the cause remains to be considered. The chancellor recalled the husband after he had recalled the wife to the witness stand, to inquire what was his attitude with respect to his wife's continuing to live with him. The reply of the husband was that her repeated abandonments had left him without any confidence in her, and that he did not want her back. The answer related to the reasons why he would not desire to resume cohabitation and, so, was not a refusal to permit her to return. Nor, in the absence of a proper offer of the wife to return, could the husband be thus put to an election. The wife must recover upon a cause of action subsisting at the time of her suit, although the subsequent conduct and declarations of the parties may, subject to applicable limitations imposed upon its admissibility, be received in evidence in corroboration or as reflecting upon the fault of the parties with respect to their separation. *McClees v. McClees*, 162 Md. 70, 74, 77, 80, 158 A. 349; *Schwab v. Schwab*, 93 Md. 382, 385, 387, 49 A. 331; *Schwab v. Schwab*,

96 Md. 592, 595, 597, 54 A. 653; *Poehlman v. Poehlman,* 130 Md. 695, 102 A. 1052; *Carter v. Carter,* 139 Md. 265, 271, 114 A. 902; *Sterling v. Sterling,* 145 Md. 631, 642, 125 A. 809; *Wagner v. Wagner,* 130 Md. 346, 349, 100 A. 364.

There is, moreover, not much weight to be given to the answer of the wronged spouse in reply to the question whether he would renew cohabitation with the erring spouse upon her equivocal declaration that she might be willing to return, which she had, a few minutes before, freshly made in the course of her testimony in open court, since time for consideration, reflection, and decision was necessary to a conclusive reply. 9 *R. C. L.,* sec. 161, p. 373. The rights of the wronged spouse, however, cannot be made to depend upon the nature of his answer as to what he would do in imaginary circumstances, which had not assumed any definite form. *Supra.* See 2 *Bishop on Marraige and Divorce,* sec. 1483.

The allegations of the bill of complaint are in the most general terms, but the plaintiff has failed to substantiate any cause, which would entitle her to a divorce from the husband, that existed at the time of the filing of her bill of complaint, and, therefore, the bill for permanent alimony must be dismissed. *McClees v. McClees,* 162 Md. 79, 158 A. 349; *Simmont v. Simmont,* 160 Md. 432, 153 A. 665; *Outlaw v. Outlaw,* 118 Md. 498, 84 A. 383; *Silverberg v. Silverberg,* 148 Md. 691, 130 A. 325; *Wendel v. Wendel,* 154 Md. 20, 139 A. 573; *Ewing v. Ewing,* 154 Md. 85, 140 A. 37; *Buckner v. Buckner,* 118 Md. 113, 84 A. 156; *Hoffhines v. Hoffhines,* 146 Md. 352, 126 A. 112.

*Decree reversed, and bill dismissed with costs to be paid by the appellee.*