## ASHMAN v. ASHMAN

[No. 65, October Term, 1949.]

*Decided March 8, 1950.*

The cause was argued before MARBURY, C. J., COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

Submitted on brief by *Ashman & Link* for the appellant.

*Samuel K. Dennis*, with whom was *Eugene M. Feinblatt* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is a suit for permanent alimony. An appeal is taken by Louis S. Ashman, hereinafter referred to as

appellant, from that part of the decree of Circuit Court No. 2 of Baltimore City, granting his wife Olga E. Ashman, hereinafter referred to as the appellee, permanent alimony from the said Louis S. Ashman of $50 per week, and requiring the said Louis S. Ashman to pay the sum of $850 as counsel fee for the solicitor for his wife. A cross-appeal is taken by Olga E. Ashman from that part of the decree allowing alimony in the amount of $50 per week. She claims that this allowance should be in a larger amount.

The parties to this case were married on July 17, 1910. At the time that this case was brought, she was fifty-nine years of age and he was sixty-one years old. At least since 1937 these parties have lived rather a turbulent married life. They became separated at least temporarily on two previous occasions. The appellant has been a lawyer of rather extensive practice at the Baltimore City Bar and is the author of a number of law books. His wife, until their marriage, was a public school teacher. No children have been born to these parties but they adopted two children, a boy, Robert, a graduate of the Harvard Law School and now a member of the Maryland Bar, and a girl, Carol, now Mrs. Herbert Stern.

The appellee in her bill of complaint filed September 14, 1948, alleges that the appellant on September 9, 1948, without just cause abandoned and deserted her and asks among other things for permanent ailmony and counsel fee. She further alleges that he enjoys an annual income of between $20,000 to $25,000 as a practicing attorney. The appellant in his answer denies that he deserted his wife on September 9, 1948, and claims that there was a mutual separation of the parties on that date. He denies that he makes $20,000 to $25,000 annually and states that during the first nine months of 1948 he did not even earn his office expenses.

The testimony shows that in spite of two former separations the parties lived together previous to September 9, 1948. On July 1, 1947, the appellant wrote a letter

to the appellee and sent a copy to their adopted son Robert, in which he says in part: "But in any event I will *not* any longer seek a home in an apartment for you and me." On the evening of September 7, 1948, he made a suggestion that they mutually separate. She denies that she ever entered into any such an agreement. They had some discussion about a new home he had bought or contemplated buying, the Cathedral Street home. She says that evening they were playing a game of cards when he suddenly said to her: "What's on your mind?" He accused her of not wanting to live in the Cathedral Street house with him. She said he became very angry and told her: "It is time for us to break up this marriage." She says he offered to pay her back $10,000 which she claimed was hers, and give her 30% of his earnings and he then went to bed. She claims that she never agreed to any such arrangement. She says on Wednesday morning the appellant got out of bed and said he was going to take his bookcase, bed, bureau, and bring $10,000 to her within a few days, and give her 20% of his earnings. Appellant went down town. He came home that evening, Wednesday, September 8th, having had dinner. She told him that she had an errand to do down the street. When appellee returned at half past eight the bureau was open, the closet door open, his clothes were all over the room, and he had gone. The next day, September 9th, he wrote appellee a special delivery letter in which among other things he advises his wife that he was residing with friends, the Southards, in Guilford, until he settled for the house at 513 Cathedral Street or "until you advise me that you intend to join me at the Cathedral Street Home and cooperate in good faith." They have not lived together since.

Appellant's version of the separation on September 8th follows. The parties were playing cards and talking about the house he was contemplating buying. She made complaints to him about the bathroom. She mentioned the $10,000 cash that he talked about once before in settlement and a percentage of his earnings. He said he re-

plied that his earnings would not be anything because his hearing was becoming defective, but he admits he said: "O.K., if this is the way you feel about it," and then went to bed. He says the next morning he got up and said: "Well, Olga, I think the whole thing is a mistake." He dressed and went down town. He came back that evening and began to undress. He said he asked her, "Can I talk to you?" And she went out. He waited about two hours for her to come back. He redressed and took two shirts, two suits, and some socks and handkerchiefs, and went to the Southards, friends in Guilford. He talked the matter over with them and they invited him to stay with them that night. He then sent his wife the special delivery letter, hereinbefore referred to dated September 9th.

It seems to be true that the appellant made the suggestion on September 7, 1948, for a separation. There is no corroboration of appellant's testimony that appellee agreed to this. His special delivery letter of September 9th in which he advises her that he is residing with friends in Guilford, until he settles for the property on Cathedral Street or until she advises him that she intends to join him at the Cathedral Street home, seems to absolutely negative any separation agreement. As pointed out by the Chancellor who had the parties before him, the appellant had the key to the apartment in which his wife was living. All he had to do was to return.

Of course, permanent alimony should not be awarded unless the plaintiff shows sufficient grounds to support a divorce a *mensa et thoro* or a *vinculo matrimonii*. *Zukerberg v. Zukerberg*, 188 Md. 428, 53 A. 2d 20, and cases there cited. Here the appellant left his wife on September 8, 1948, for no just reason. He did not leave her because she failed to follow him to the Cathedral Street home, but merely because he claims she said she would not move there. At the time he left he had not settled for that house, and apparently had no intention of moving there at that time. He did not go there to live

until at least a month after he left his wife. Although he had the key to the apartment, where his wife lived and this was his only home at that time, he remained for about a month with friends until he settled for the Cathedral Street property. There was no just reason for him to leave his wife.

There appears to have been no sincere effort of reconciliation on his part. From the testimony he did not visit his wife and try to be reconciled. His only contact with her was by mail. As was said in *Wise v. Wise,* 159 Md. 596 at page 600, 152 A. 230, 232, he "failed to explain satisfactorily his omission to make a direct appeal to his wife for the resumption of their conjugal relations. It is hard to reconcile his personal aloofness with an earnest desire to accomplish that result. The course which he pursued with respect to the proposed reunion was, in our opinion, insufficient to shift responsibility for the continuance of the separation. His policy seems to have involved no effort to conciliate and reassure his wife by an expression of regret for his past misconduct, * * *." *Kirkwood v. Kirkwood,* 165 Md. 547, 551, 170 A. 180. *Zukerberg v. Zukerberg, supra,* 188 Md. 436, 53 A. 2d 23. Appellant stresses the fact that during the hearing of the case appellee was asked the following question: "Mrs. Ashman, is it your wish or desire to live with Mr. Ashman as husband and wife?" She answered: "Not at this point. It was until he left in September." As was said by this Court in the case of *Hokemeyer v. Hokemeyer,* 193 Md. ??? 71 A. 2d 15, 17, appellant seems to have "a misconception of the evidentiary weight of a formal legal tender in a field of the law concerned with the most intimate of human relations." We are of opinion that alimony was properly decreed.

Of course, before determining the amount of an alimony award the court should consider the station in life of the parties, their financial situation, age and physical condition, ability to work, the length of time they have lived together, circumstances of the separation, the fault which caused the separation, and the husband's earning

capacity. *Timanus v. Timanus,* 178 Md. 640, 642, 16 A. 2d 918. *Dougherty v. Dougherty,* 187 Md. 21, 33, 48 A. 2d 451..

The Chancellor made a careful analysis of appellant's income and found in 1947 that his net income, after taxes, was $11,353.38. Appellant admits that his gross receipts for the last eleven months ending November 30, 1948, were $8,770.58. The Chancellor further found that "He also had a number of securities and his equity in 513 Cathedral Street and the Court would not hesitate to say that his net worth is at least sixty thousand dollars. If we calculate twelve months gross income for 1948 on the same basis as the eleven months above, the figure is $9,800, less the same proportionate office expenses incurred last year it would be $6,816, before taxes, from his professional fees alone. His income from dividends and interest in 1946 was $2,771.29, before taxes, and no doubt his income from these sources or 513 Cathedral Street will be ample to pay all his income taxes for 1948. These figures indicate that an allowance of $50.00 per week will be fair to both parties." The appellee claims that appellant has a net worth of almost $84,000, based on the testimony of witnesses employed by two of the largest brokerage firms in Baltimore. We are of opinion that at this time the award of $50 per week made by the Chancellor, as alimony should not be disturbed. The. amount of alimony can .always be adjusted in the light of changed conditions of the parties. *Safe Deposit & Trust Co. of Baltimore v. Robertson,* 192 Md. 653, 663, 65 A. 2d 292, 296.

We are also of opinion that the award of $850 as counsel fee for the solicitor of the appellee should be affirmed. *Daiger v. Daiger,* 154 Md. 501, 509, 140 A. 717.

> *Decree affirmed, costs to be paid by Louis S. Ashman.*